UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re ANHEUSER-BUSCH INBEV SA/NV SECURITIES LITIGATION | : | Civil Action No. 1:19-cv-05854-AKH |
| | : | CLASS ACTION |
| This Document Relates To: | : | AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| ALL ACTIONS. | : | DEMAND FOR JURY TRIAL |

Lead Plaintiff City of Birmingham Retirement and Relief System ("Lead Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based upon information and belief as to the investigation conducted by Lead Plaintiff's counsel, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Anheuser-Busch InBev SA/NV ("Anheuser-Busch" or the "Company"), media and analyst reports about the Company, Company press releases, Defendants' (defined below) public statements and other public statements issued by, or about, the Company. Lead Plaintiff believes that substantial additional evidentiary support will likely exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action brought on behalf of all purchasers of Anheuser-Busch American Depositary Shares ("ADSs"), each of which represents one of the Company's ordinary shares, between March 1, 2018 and October 24, 2018, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2. Defendant Anheuser-Busch is the world's largest brewer, carrying a portfolio of over 500 brands by the beginning of the Class Period. The Company has grown rapidly since 2000, driven by an ambitious acquisition strategy that included InBev's $52 billion purchase of Anheuser-Busch in 2008 and culminated in a merger with SABMiller in 2016 worth over $100 billion. These acquisitions saddled the Company with enormous debt, which ballooned to 5.5 times earnings before interest, tax, depreciation and amortization expense ("EBITDA") following the SABMiller combination, despite the Company's supposed "optimal capital structure" strategy of deleveraging to a net debt to EBITDA ratio of 2.0, which is in line with its peers. As a result, the Company was forced to embark on a "path to deleveraging" that it assured investors would ***not*** include cutting

Anheuser-Busch's long-coveted dividend, which had increased each year since 2008 until plateauing at €3.60 per share in 2015. This case concerns Defendants' false and misleading statements and omissions about Anheuser-Busch's ability and intention to grow or maintain the Company's dividend consistent with its deleveraging strategy, and about the Company's positioning to insulate itself from currency volatility and cash flow constraints on its ability to pay the dividend, in the face of mounting debt and financial strain.

3. Despite the Company's mammoth debt level following the SABMiller deal, Defendants continually reassured investors during the Class Period that the "[r]eturn of cash to shareholders" was one of Anheuser-Busch's key capital allocation objectives, and that dividends would be "a growing flow over time," and would grow "modest[ly]" in the short term. Defendants also repeatedly assured investors that the Company "remain[ed] on track in [its] deleveraging path" to meet its stated net debt to EBITDA ratio of "around 2x." Defendants also sought to assure investors that the Company's "debt portfolio [was] structured to protect against . . . currency risk," explaining on a July 26, 2018 conference call that the Company's debt profile and "benefit mix of currencies [] ***mitigates the [currency] risk***," despite having significant exposure to emerging market currency fluctuations.[1]

4. In further efforts to assuage investors' concerns about the Company's mounting debt and assure them that Defendants were "tracking in line" to deleveraging, defendant Felipe Dutra ("Dutra"), Anheuser-Busch's Chief Finance and Solutions Officer, highlighted on the July 2018 conference call that the Company's liquidity levels – which were at approximately $17 billion – provided "***plenty of cash***" and "***more than [the Company] will actually need*** in the coming years" to remain on the Company's stated track to "deleveraging in approximately half a turn of net debt-to

1 All emphasis is added unless otherwise noted.

EBITDA reduction per year . . ." Dutra similarly explained on the call that, historically, Anheuser-Busch generated 65-75% of its annual cash flows in the second half of the year, and that the Company expected cash flows in the second half of 2018 to be "on the higher end of this range."

5. Additionally, Defendants specifically chose during the Class Period to distinguish and highlight the Company's financial position following the SABMiller combination as compared to its financial position in 2008, emphasizing that the Company's "financial position today is far stronger than it was during the [InBev and] Anheuser-Busch combination," when the Company did cut its dividend. For example, during the Company's investor seminar held from August 7-9, 2018, Defendants stressed that the state of the global economy, the cost of financing, the Company's operating flexibility and the path to deleveraging were all different following the 2008 acquisition than the 2018 SABMiller acquisition. When Dutra presented on August 9, 2018, he also highlighted that "[u]nlike in 2008, we have ***ample liquidity*** and access to deep and liquid capital markets around the globe."

6. Significantly, defendant Dutra told investors at the August 2018 seminar that "***no drastic measures were required*** for us to deleverage as a result of the SAB combination," given that the Company's current "path to deleveraging is different today than it was in 2008" when InBev acquired Anheuser-Busch and announced – ***before the close of the acquisition*** – that it would cut its dividend payments. Indeed, Defendants bolstered Dutra's statements by ***affirmatively choosing to differentiate the "path to deleveraging" following the SABMiller acquisition from the InBev combination in 2008 by omitting a "dividend cut" as a measure to accomplishing their deleveraging objective*** as they had done in 2008, as reflected in the following slide presented by Dutra at the investor seminar on August 9, 2018:



**Given this backdrop, the path to deleveraging is different today than it was in 2008**

| | Macro Backdrop | Financing | Operating Flexibility | Path to Deleveraging |
|---|---|---|---|---|
| ANHEUSER-BUSCH | Global financial crisis | Expensive short and medium-term debt | Extremely limited flexibility, no room to pursue opportunistic initiatives / investments | • Significant divestitures<br>• Dividend cut<br>• Bare bones CapEx<br>• Early days of core working capital management at +2.1% of net revenue |
| SAB MILLER | Relatively stable global growth | Historically low cost, long-term debt | Significant flexibility to invest in long-term future of our business | • Divestitures driven by regulatory reasons<br>• Core working capital management as a best practice, replicated across the enlarged footprint at -13.4% of net revenue in 2017 |

6 ABInBev

(Arrow and highlighting of "Dividend cut" added.)

7. Defendants' positive statements created a false impression and materially misled investors about the Company's deleveraging efforts, financial stability and sustainability of, and intention and ability to pay, Anheuser-Busch's dividend without taking the extreme measure of slashing the dividend for the first time in 10 years. Once Defendants chose to speak about these matters, they had a duty to speak completely and truthfully, including speaking about those factors that were then having a material adverse effect on the Company's deleveraging efforts and expected dividends. Indeed, Defendants' Class Period statements led analysts and journalists covering Anheuser-Busch to understand that the dividend that the Company had reliably delivered for years was "safe" and "secure." Defendants' scheme to deceive the market and corresponding Class Period statements artificially inflated the price of Anheuser-Busch ADSs and operated as a fraud or deceit on Class Period purchasers of Anheuser-Busch ADSs.

8. While Defendants were issuing positive statements about the Company's finances and reassuring investors that "no drastic measures" were necessary for Anheuser-Busch to fulfill its deleveraging strategy – unlike in 2008 when the Company implemented a dividend cut – Defendants

knew, or recklessly ignored that the devaluation of key emerging market currencies and input cost inflation (*e.g*., increasing barley costs and high aluminum cost inflation) were having a material adverse effect on the Company's margins, EBITDA and profitability; the Company had been experiencing less than expected growth and profits in certain key markets, including constantly eroding market share in the U.S. due to the rise in popularity of the craft and premium brands; that approximately 40% of Anheuser-Busch's debt was then expected to mature within a five-year period; and that as a result, Defendants would have to cut the Company's dividend to accelerate deleveraging.

9. On October 25, 2018, when Anheuser-Busch announced its financial results for the quarter and nine month period ended September 30, 2018, the Company revealed that it had slashed its dividend by ***50%*** "in light of recent currency volatility" to "accelerate deleveraging toward [the Company's] optimal capital structure of around a [2x] net debt to EBITDA ratio. . . ." Despite telling investors throughout the Class Period and as recently as two months earlier that dividends would be growing over time, including modest short term growth, the Company revealed for the first time that such growth could now flow only "[f]ollowing this [dividend] rebase of 50%." Moreover, Defendants justified the cut by referencing recent currency volatility despite the fact that Anheuser-Busch had already been experiencing "adverse currency fluctuations" which contributed to increasing the Company's debt to EBITDA ratio in the first half of 2018, and despite Defendants' assurances that the Company's debt portfolio was structured to and did in fact mitigate currency risk. In response to news of the dividend cut, the price of Anheuser-Busch ADSs plummeted approximately 9.5%, from $82.25 per ADS to $74.54 per ADS – the largest decline in nearly 10 years – eliminating approximately ***$15 billion*** of the Company's market capitalization on heavy trading volume.

10. Analysts covering the Company understandably expressed shock at the announcement that the Company was cutting the dividend in half, particularly in light of Defendants' positive statements about the Company's financial positioning and ability to maintain or grow the dividend. On October 25, 2018, a Guggenheim analyst described the move as an "[u]nexpected dividend cut," the "biggest surprise" of the Company's earnings announcement, and the "reason for much of the stock's 10% sell-off" that day. The following day, an ABN AMRO analyst described the dividend cut as "unexpected," and, referencing the "[l]ight 3Q18 results," said that "[e]verything [was] overshadowed by the material dividend cut." A Kepler Cheuvreux analyst wrote that the dividend cut "comes despite sufficient liquidity and a balance sheet 'insured' against interest rate increases." Given the Company's detailed statements that no dividend cut would happen during the Class Period, the market was shocked by this news.

**JURISDICTION AND VENUE**

11. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5. This Court has jurisdiction over the subject matter of this action under Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331, because this is a civil action arising under the laws of the United States.

12. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b) - (d), as many of the acts constituting the alleged violations of law complained of herein occurred in this District. In addition, AB InBev Services LLC, Anheuser-Busch's authorized agent for service of process, is located in this District.

13. In connection with the acts alleged in this Complaint, Defendants (defined below) directly or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, the United States mail, interstate telephone and other electronic communications,

and the facilities of the New York Stock Exchange ("NYSE"), a national securities exchange located in this District.

## PARTIES

14. Lead Plaintiff City of Birmingham Retirement and Relief System, as set forth in its earlier-filed certification and incorporated herein by reference, purchased the ADSs of Anheuser-Busch during the Class Period and has been damaged thereby.

15. Defendant Anheuser-Busch InBev SA/NV is a publicly traded company engaged in the production, distribution, and sale of beer, alcoholic beverages, and soft drinks worldwide. The Company is the successor entity to former AB InBev, which was formed when InBev (itself a merger between Interbrew from Belgium and AmBev from Brazil in 2004) acquired Anheuser-Busch in 2008. The Company was incorporated in March 2016, and was enlarged in October 2016 when it purchased SABMiller and concluded a merger of the two entities. Anheuser-Busch was the world's largest brewer even before the acquisition of SABMiller. The Company maintains its headquarters in Leuven, Belgium and its ADSs trade on the NYSE under the ticker symbol "BUD." Anheuser-Busch has a portfolio of over 500 beer brands, including Budweiser, Corona, Stella Artois, Beck's, Castle, Hoegaarden, Leffe, Aguila, Bud Light, Brahma, Michelob Ultra, Modelo Especial and Quilmes. With approximately 175,000 employees based in nearly 50 countries worldwide, Anheuser-Busch's reported revenue for 2018 was $54.6 billion (excluding joint ventures and associates).

16. Defendant Carlos Brito ("Brito") is, and was at all relevant times, Anheuser-Busch's Chief Executive Officer ("CEO").

17. Defendant Felipe Dutra is, and was at all relevant times, Anheuser-Busch's Chief Financial and Solutions Officer.

18. Defendants Brito and Dutra are collectively referred to hereinafter as the "Individual Defendants." Anheuser-Busch and the Individual Defendants are collectively referred to herein as "Defendants."

19. Because of the Individual Defendants' executive positions, they each had access to the undisclosed adverse information about Anheuser-Busch's business, operations, liquidity, currency risk, operational trends, deleveraging efforts, controls, markets, and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof.

20. It is appropriate to treat Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications, as alleged herein, are the collective actions of the narrowly defined group of Defendants identified above. Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, liquidity, controls, deleveraging efforts, growth, products and present and future business intentions and prospects as alleged herein. In addition, the Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements in violation of the federal securities laws.

21. As officers and controlling persons of a publicly-held company whose ADSs are registered with the SEC pursuant to the Exchange Act and trade on the NYSE, which is governed by

the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, business, products, markets, management, liquidity, currency risk, deleveraging efforts and present and future business prospects. In addition, the Individual Defendants each had a duty to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded ADSs would be based upon truthful and accurate information. Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

22. The Individual Defendants, because of their positions of control and authority as Officers of the Company, were able to, and did, control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

23. Each Defendant is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Anheuser-Busch ADSs by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Anheuser-Busch's business, operations, liquidity, currency risk, markets, deleveraging efforts, management, and present and future business intentions and prospects, and the intrinsic value of Anheuser-Busch ADSs; and (ii) caused Lead Plaintiff and the Class to purchase Anheuser-Busch publicly-traded ADSs at artificially inflated prices.

## BACKGROUND

**Anheuser-Busch's Ambitious Acquisition Strategy and Accumulation of Massive Debt**

24. Belgium-based defendant Anheuser-Busch was incorporated in March 2016 and is the successor of former AB InBev. With a portfolio of over 500 brands, including, among others, Budweiser, Corona, Michelob, Bass, Stella Artois, Beck's, Modelo, Shock Top, Brahma, Blue Point and Goose Island, and a brewing heritage dating back more than 600 years, Anheuser-Busch is one of the world's most iconic companies and is the world's largest brewer by volume, primarily via a series of major business combinations and acquisitions.

25. InBev came into existence when Interbrew of Belgium and AmBev of Brazil merged in 2004. In 2008, AB InBev was formed when InBev acquired America's largest beer maker, Anheuser-Busch Companies, for $52 billion. In 2013, AB InBev acquired control of Mexican brewer Grupo Modelo, and, in April 2014, it completed the acquisition of Korea's Oriental Brewing. Then, in October 2016, Anheuser-Busch completed an all-cash $103 billion merger with SABMiller in what the *Financial Times* reported was the third largest acquisition in history and the largest ever in Britain, where SABMiller remained headquartered until its main corporate functions merged with Anheuser-Busch's in Belgium. The SABMiller deal allowed the Company to penetrate fast-growing markets in Africa and outside the United States, where drinkers are shifting from Anheuser-Busch mass-market staples like Budweiser and Bud Light to craft beer, wine and spirits.

26. Following the SABMiller combination, Anheuser-Busch continued its acquisition strategy but limited its targets to smaller, national craft brewers, predominantly through its "The High End" craft beer division and, most recently, the ZX Ventures incubator unit, which was created in 2015 "with the mandate to accelerate innovation by addressing emerging consumer needs with

new and disruptive products and businesses."[2] Recent purchases prior to the end of the Class Period included the UK-based global e-commerce platform Master of Malt and U.S. beer ratings website RateBeer. The Company also purchased two home-brew supply houses. The addition of Virginia-based Devil's Backbone to Anheuser-Busch's The High End portfolio in April 2016 marked the eighth purchase of a U.S.-based craft brewer over an approximately 5-year period beginning in March 2011, when the Company purchased a 58% stake in Chicago-based Fulton Street Brewery – the legal name for Goose Island – for $38.8 million. The following chart reflects these U.S. acquisitions leading up to the SABMiller combination:

AB's Craft Beer Shopping Spree

| Craft Brewer | Year Purchased |
|---|---|
| Goose Island | March 2011 |
| Blue Point Brewing | Feb. 2014 |
| 10 Barrel Brewing | Nov. 2014 |
| Elysian Brewing | Jan. 2015 |
| Golden Road Brewing | Sept. 2015 |
| Breckenridge Brewing | Dec. 2015 |
| Four Peaks Brewing | Dec. 2015 |
| Devil's Backbone Brewing | April 2016 |

Ashlee Kieler, *Here Are The 8 U.S. Craft Brewers Bought By Anheuser-Busch Since 2011*, CONSUMER REPORTS (Apr. 13, 2016), https://www.consumerreports.org/consumerist/here-are-the-8-u-s-craft-brewers-bought-by-anheuser-busch-since-2011/. The Company followed the

2 The High End division has since been rebranded as Anheuser-Busch's "Brewers Collective."

SABMiller combination with two additional U.S. craft beer purchases: Texas-based Karbach Brewing Co. in November 2016 and North Carolina-based Wicked Weed Brewing in May 2017.

27. The Company's numerous purchases – and in particular the SABMiller acquisition – caused Anheuser-Busch's debt to skyrocket. By the end of 2016, the Company's net debt to EBITDA ratio – a financial measure of leverage, calculated as an entity's gross debt minus cash on hand, divided by its EBITDA – exploded to approximately 5.5. The Company's debt itself nearly doubled from approximately $86 billion to ***$166 billion*** between the end of 2013 and 2017. While the Company's net debt to EBITDA ratio remained at 4.80 as of December 31, 2017, more than double the level just three years prior, by the end of June 2018, the ratio crept back up to 4.87.

28. This amount of leverage is materially higher than most of the Company's consumer staple group peers, which have an average net debt to EBITDA ratio of between 2.0 and 3.0, and is materially higher than the Company's stated "optimal capital structure" of a net debt to EBITDA ratio of 2.0. In fact, during the Class Period, debt ratings agencies stated that Anheuser-Busch's credit was subject to a potential rating downgrade if the Company's net debt to EBITDA is not reduced to 3.0 by fiscal 2020. That is because overleveraged companies face higher borrowing costs and financial peril in the event of a financial downturn or if credit markets freeze up. On October 1, 2018, Moody's placed Anheuser-Busch on review for downgrade. Then, in December 2018, following the end of the Class Period, Moody's downgraded the Company's credit rating to Baa1 from A3.

29. Anheuser-Busch's market share has been steadily eroding in the United States for the past 10 years as the Company's mainstream segment "remains under pressure as consumers move to higher-price tiers." Indeed, this is the primary driver for why the Company has embarked on its domestic acquisition spree of craft brewers and other related entities. The declining market share

trend continued into the first quarter of 2018, when the Company's core, light and value brands lost another percentage point of market share. Anheuser-Busch also faced economic trouble following the SABMiller deal, which increased the Company's exposure to fast-growing, but volatile emerging markets. Although the move to gain more emerging market share made sense given the decline in United States and other mature markets like Western Europe, it also put further stress on the Company when Brazil and South Africa fell into a recession following the SABMiller combination.

**The Anheuser-Busch Dividend**

30. While Anheuser-Busch has a long history of consistently paying dividends to its shareholders, the Company cut its dividend once before when InBev and Anheuser-Busch combined in 2008. After announcing the deal, but ***prior*** to closing, the Company specifically disclosed the fact that it would need to cut dividends "for a period of 2-3 years before returning to [then-]current levels" as a result of the 2008 combination. Indeed, the Company highlighted at the time that "[r]educing the company's leverage to its historical level of below 2x EBITDA is of the ***highest priority*** to Anheuser-Busch InBev's management." As pointed out by defendant Dutra during the Class Period, that transaction was significantly different than the later combination with SABMiller in 2016 in several key respects and given several unique factors, most notably, because by 2018, following the SABMiller deal: (1) the Company had nearly doubled EBITDA; (2) "debt [wa]s much cheaper and longer dated"; (3) the Company had a "significantly larger liquidity cushion"; (4) the Company had "limited short-term refinancing needs"; and (5) "unlike in 2008 – [the Company did] not have any financial covenants." Defendants further emphasized that "[t]he economic outlook for the world was more bearish in 2008 than it [was in 2018]."

31. Following the 2008 dividend cut, Anheuser-Busch steadily increased its dividend payment until 2015, when the dividend plateaued at €3.60 per share, as depicted in the following chart published by Anheuser-Busch in 2018:

# Dividend Payments




Payouts, Anheuser-Busch, Internet Archive Wayback Machine, Oct. 10, 2018, https://web.archive.org/web/20181010211356/https://www.ab-inbev.com/investors/payouts.html.

32. In 2018, even as the Company's debt skyrocketed, analysts understood that the dividend was "safe" and "secure," particularly in light of Defendants' Class Period statements and positive outlook on Anheuser-Busch's short and long term prospects (discussed further below). For example, an analyst for Morningstar Equity Research concluded on March 4, 2018 (and repeated in reports throughout the Class Period, including most recently on July 26, 2018) that "we do not expect a dividend cut" from Anheuser-Busch for three reasons:

> First, the Anheuser-Busch acquisition [in 2008] was executed amid the worst financial recession in a generation. This time, although some markets such as Brazil and the U.S. are experiencing difficulty, market contraction is fairly isolated and the credit markets remain open. Second, at a weighted average coupon rate of just 3.7%, the interest rate on the debt is lower and manageable. Third, from a free cash flow to the firm run rate of [sic] $15 billion in 2017, we model just over $10 billion being paid out annually as dividends and the remainder being used to pay back borrowings. At an annual rate of $5 billion in debt reduction, we believe AB InBev can reduce the leverage on its balance sheet to just over 3 times net debt/EBITDA by 2022 without any risk to its dividend.

33. Likewise, a September 11, 2018 Everscore ISI analyst concluded that Anheuser-Busch's dividend was "secure" and that the Company was on a consistent path to deleveraging without cutting the dividend:

> **While deleveraging progress has been slower than we had anticipated, and recent FX moves don't help, *we believe the €3.60/share annual dividend is secure*, barring a large opportunistic acquisition**. We believe the $4.4 billion net debt increase in 1H18, with leverage up from 4.80x to 4.87x, was driven by normal seasonality, timing mismatch of balance sheet and P&L translation, and one-off cash tax payments in 1H18 vs one-off credits in 1H17. We expect the firm do [sic] delever by ~0.5 turn per year on average, with 2018 somewhat below that due to the FX headwinds.[3]

34. One financial journalist wrote an article for *Seeking Alpha* on October 3, 2018, entitled "Anheuser-Busch InBev: The Dividend Appears Safe," concluding not only that the Anheuser-Busch dividend "***is safe***," but that the 2018 dividend would actually increase from 2017. The author explained that his conclusion was based at least in part on ***management's "positive commentary"*** on the Company's last earnings report that showed "***optimism***," citing Company statements about modest short term dividend growth and accelerated second half growth. Yet another analyst described Anheuser-Busch's dividend as "secure" around this time, explaining that "[c]onsidering AB InBev's stable operations, continued EBITDA growth, strong credit rating, expected improvement in second-half cash flow generation, multiple levers to free up additional cash (divestitures, scrip dividend, etc.), and ***management's commitment*** to continuing the firm's existing capital allocation framework, the ***dividend appears to remain secure*** for now."

35. On October 17, 2018, an analyst writing for *Seeking Alpha* pointed to the placement of Defendants' own conflicting statements about Anheuser-Busch's desire to deleverage to optimal levels "right alongside the information on dividends on BUD's investor relations webpage" to suggest that cutting the dividend "would show an ***extreme lack of foresight*** on management's part as

---

3 Non-italicized emphasis in original.

there was no scenario possible where a 2X net debt to EBITDA could have been accomplished alongside modest dividend growth. They should have seen that and ***not made inherently contradictory statements***." Likewise, just days before the end of the Class Period, an analyst from ABN AMRO projected a "flat interim dividend of EUR 1.60/share, which would ***reconfirm earlier statements from management*** that cash generation is particularly skewed to the second half of the year in fiscal 2018." "***Taking into consideration ABI's comments on cash flows*** in the first half and in the second half of the year," the analyst continued, "***we do not expect ABI to announce a dividend cut***."

**Defendants Slash the Coveted Anheuser-Busch Dividend in Half**

36. On October 25, 2018, when Anheuser-Busch announced its financial results for the quarter and nine month period ended September 30, 2018, the Company revealed that it had slashed its dividend by ***50%*** supposedly "in light of recent currency volatility" to "accelerate deleveraging toward our optimal capital structure of around a 2x net debt to EBITDA ratio. . . ." That same day, Anheuser-Busch held a conference call with analysts and investors during which defendant Dutra reiterated that the Company would be cutting its dividend stating, in pertinent part:

> Our fourth priority is returning excess cash to shareholders in the form of dividend and share buybacks. ***Consistent with these long-standing capital allocation priorities, and in light of recent currency volatility, we are rebasing our dividend payout to accelerate deleveraging towards our optimal capital structure of around 2x***, while continuing to prioritize investment in organic growth opportunities and creating greater financial flexibility.

37. Despite assuring investors throughout the Class Period that dividends would be growing over time, including modest short term growth, the Company revealed that such growth would now happen only "***[f]ollowing this rebase of 50***%," a radical shift in Defendants' position that was never previously disclosed to investors. And, according to an October 25, 2018 *Reuters* report, Dutra further justified the cut by stating that, "'***[i]n the last six months, we've seen a lot of***

***(currency) volatility. This scenario triggers some sort of uncertainty and at a certain point . . . we thought it was the right time to adjust the dividend**.'"* But the circumstances surrounding Defendants' referenced justifications for the cut had not materially changed given that: (1) Anheuser-Busch's "long-standing capital allocation priorities" remained constant throughout the Class Period, including in the months leading up to the dividend cut; (2) Defendants assured investors throughout the Class Period that the Company was "tracking in line" to delever to two times net debt to EBITDA; and (3) the Company was already experiencing "adverse currency fluctuations," as disclosed in connection with its July 26, 2018 earnings release and confirmed by Dutra at the end of the Class Period, which contributed to the increase in the Company's debt to EBITDA ratio in the first half of 2018.

38. With respect to Defendants' stated "recent currency volatility" justification for the cut, defendant Dutra sought to quell any such concerns about currency risk in the context of deleveraging in a July 26, 2018 investor conference call where he stated, "we have a benefit mix of currencies that ***mitigates*** the FX [*i.e.*, currency] risk." In fact, the Company repeatedly told investors that the Company's debt portfolio was "structured to protect against . . . currency risk." It is thus no surprise that, in light of Defendants' Class Period statements assuring investors that the Company was inoculated from business risks associated with currency exposure, analysts were shocked at the Company's decision to cut the dividend. For example, on October 26, 2018, an analyst from ABN AMRO described the dividend cut as "***unexpected***" . . . ***We had not expected this***, and think ***ABI could have maintained its dividend*** as liquidity and coverage ratios are fine, in our view." Likewise, a Guggenheim analyst noted on October 25, 2018:

> **Unexpected dividend cut**. Management announced a 50% re-basing of the dividend to reallocate the cash to debt reduction, while still prioritizing investments in organic growth opportunities. We estimate the lower dividend will increase debt repayments by $4B per year and our model suggests net debt to EBITDA of 3.8x by FY20

> (previously 4x) – recall the rating agencies' target of 3x ratio by FY20. Furthermore, we estimate the company can reach 2x (its optimal capital structure) by mid-2024, at least 2 years sooner than it would have otherwise. While ***we are surprised that management saw the need to lower the dividend***, the bigger question now for us is 'why.' We see three possible answers: 1) conservatism, 2) expectation of impending economic challenges in the US or in emerging markets, especially Latin America which generates an estimated 45% of the company's free cash, and / or 3) the desire to deleverage sooner so it doesn't miss an opportunity to make another strategic acquisition in the next few years.[4]

39. Moreover, an analyst with Kepler Cheuvreux wrote on October 25, 2018 that the dividend cut "comes despite sufficient liquidity and a balance sheet 'insured' against interest rate increases." Additionally, a former IronBridge Capital Management analyst noted on October 30, 2018 in a *Simply Safe Dividends* article that because "***free cash flow more than covered [the Company's] dividend***, and overall sales, EBITDA, and profit margins were actually improving," the dividend cut inevitably "involved some discretion," particularly given that "unlike most companies that ultimately reduce their payouts," Anheuser-Busch "was not facing any liquidity issues, even ***despite currency volatility in emerging markets***." Indeed, when asked why management settled on a 50% dividend cut, defendant Dutra responded that Anheuser-Busch has about $11 billion of debt maturities from 2018 through 2020, which is ***more than covered by the Company's $17 billion of liquidity***. Dutra also emphasized that "***[f]rom the liquidity standpoint, there is no pressure whatsoever***," and further explained how the Company's debt maturities were nicely balanced with a 12-year average duration and no concentration in any year, noting that refinancing risk was "no big issue."

40. In response to the news of the Company's dividend cut, the price of Anheuser-Busch ADSs declined approximately 9.5%, from $82.25 per ADS to $74.54 per ADS, eliminating approximately ***$15 billion*** of the Company's market capitalization on heavy trading volume.

[4] Non-italicized emphasis in original.

Analysts noted that the dividend cut was the primary driver of the huge sell-off of Anheuser-Busch stock on October 25, 2018. A Guggenheim analyst wrote that same day that "***[t]he biggest surprise – and the reason for much of the stock's 10% sell-off today*** . . . ***was that management slashed the dividend in half*** to €1.80 in order to accelerate deleveraging over the coming years." Likewise, the ABN AMRO analyst, referencing the "[l]ight 3Q18 results," said that "***[e]verything [was] overshadowed by the material dividend cut***." The "***main news***" from Anheuser-Busch's third quarter results, according to the analyst, "was ABI's step to half its 2018 dividend to EUR 1.80."

**MATERIALLY FALSE AND MISLEADING STATEMENTS MADE DURING THE CLASS PERIOD**

41. The Class Period begins on March 1, 2018. On that date, Anheuser-Busch issued a press release announcing its financial results for the 2017 fourth quarter and fiscal year-end, the periods ended December 31, 2017. The press release reassured investors about the Company's deleveraging efforts, noting they were "in line" with internal targets. The press release stated, in pertinent part, as follows:

> Deleveraging to around 2x [net debt to EBITDA] remains our commitment. ***We are tracking in line with our internal deleveraging targets***, and we will prioritize debt repayment in order to meet this objective. Our Net Debt to EBITDA ratio decreased from 5.5x on a reported basis in 2016 to 4.8x in 2017, or 4.7x when adjusted for the closing of pending disposals and the foreign exchange time mismatch between the balance sheet and P&L translation. ***We will continue to proactively manage our debt portfolio, of which 93% holds a fixed-interest rate, 42% is denominated in currencies other than USD, and maturities are well-distributed across the next several years***. Our cash flow from operating activities increased by 52.6% from 10.1 billion USD in 2016 to 15.4 billion USD in 2017. In addition, we maintained over 20 billion USD in cash and revolving credit facility liquidity.

42. Concerning the Company's dividend, the press release noted that the Company "expect[s] dividends to be a growing flow over time" although "growth in the short term is expected to be modest," stating, in pertinent part, as follows:

> ***We continue to expect dividends to be a growing flow*** over time, ***although growth in the short term is expected to be modest*** given the importance of deleveraging.

43. The press release also highlighted the Company's EBITDA growth, the successful integration of SABMiller and the cost synergies related thereto, stating, in pertinent part, as follows:

> **EBITDA:** EBITDA increased by 13.4% in FY17 to 22 084 million USD, as a result of strong top-line growth and enhanced by synergy capture. EBITDA margin expanded by 288 bps to 39.1% in FY17. In 4Q17, EBITDA increased by 21.0% to 6 189 million USD with EBITDA margin expansion of 446 bps to 42.4%.
>
> * * *
>
> 2017 was a transformative year for our company. We are well on our way to achieving our most successful business integration ever and we delivered the best performance in three years. Our reshaped brand portfolio is rising to every occasion to capture future growth.
>
> **Realizing the best of both worlds**
>
> The combination with SAB has exceeded our expectations. We have incorporated the best of both companies by bringing together world-class talent, integrating best practices and deepening our understanding of consumers and occasions across all markets.
>
> Cost synergies are not only greater than originally expected, but they are also being delivered at a faster pace. Revenue synergies, although not externally quantified, are well underway through the successful launch of our global brands into new territories, among other activities.[5]

44. Along with the 2017 fourth quarter and year-end earnings press release, Anheuser-Busch issued a quarterly report presentation stating, in pertinent part, that it had "**sufficient liquidity**" (emphasis in original) and was able to satisfy its "short-term funding needs," as reflected in the following slide:

[5] Emphasis in original.




45. Additionally, the March 1, 2018 quarterly report presentation assured investors that Anheuser-Busch's "[d]iverse debt currency mix" was structured to protect against currency risk, as reflected in the following slide:



46. The March 1, 2018 quarterly report presentation also stated that "dividend growth [was] expected to be modest," as reflected in the following slide:




47. Later that day, Anheuser-Busch held a conference call with analysts and investors to discuss the Company's earnings release and business. During the conference call, defendant Dutra highlighted that Anheuser-Busch's debt portfolio reduced the Company's exposure to market volatility, and stated that the Company's dividend payment history was "consistent with" Anheuser-Busch's deleveraging commitment, stating, in pertinent part, as follows:

> ***93% of our debt portfolio is locked into fixed interest rates, reducing our exposure to markets [sic] volatility***. 58% of our debt is denominated in U.S. dollars, while roughly 33% is linked to the euro. We use the euro currency as a proxy for the emerging market basket of currencies that are relevant to our EBITDA and cash flow generation. The euro has a strong correlation with our main emerging market currencies and has the advantage of providing access to bond markets with significantly higher liquidity and lower costs. ***In order to further balance our currency mix, we have also been issuing more debt in alternative currencies such as the Canadian dollar, the Australian dollar and the British pound***.
>
> Moving now to our dividend. The board is proposing, subject to shareholders' approval, a final dividend of EUR 2 per share, which combined with the interim dividend of EUR 1.6 per share paid towards the end of last year will lead to a total dividend payment for fiscal year 2017 of EUR 3.6 per share. As you can see from

> Slide 36, ***we have maintained a dividend payment at the same level in the last 2 years and consistent with our commitment to deleveraging***.

48. In addition, Dutra reiterated that the Company's deleveraging efforts were "in line" with internal targets and that Defendants expected "modest" dividend growth in the short term, stating, in pertinent part, as follows:

> ***Our net debt-to-EBITDA ratio decreased from 5.5x on a reported basis in 2016 to 4.8x in 2017***, or 4.7x when adjusted for the closing of pending disposals and for the foreign exchange time mismatch between the balance sheet and the P&L translation. And ***we are tracking in line with our internal deleveraging targets***.
>
> ***Our optimal capital structure remains a net debt-to-EBITDA ratio of around 2x***, and our capital allocation objectives remain unchanged. Our first priority for the use of cash will always be to invest behind our brands and to take full advantage of the organic growth opportunities in our business. ***Deleveraging to around 2x remains our commitment, and we will prioritize debt repayment in order to meet this objective***. M&A remains a core competency. And we will always be ready to look at opportunities when and if they arise, subject to our strict financial discipline and deleveraging commitment. ***Our goal is for dividends to be a growing flow over time consistent with the noncyclical nature of our business.*** However, as we have said before, given our emphasis on deleveraging, ***dividend growth is expected to be modest in the short term***.

49. Defendant Dutra also highlighted the cost synergies associated with the acquisition of SABMiller, stating, in pertinent part, as follows:

> Let's start with an update on the synergies. ***In the fourth quarter, we delivered $381 million of synergies, bringing the total for fiscal year 2017 to just over $1.3 billion***. And the total synergies captured to date are over $2.1 billion. Our total synergy guidance remains at $3.2 billion to be delivered within the 4-year period following the close of the combination. This number is inclusive of the $1.05 billion of cost savings previously identified by SAB. As a reminder: These synergies do not include any top line or working capital synergies.
>
> ***We continue to expect the synergy capture to require approximately $1 billion of one-off cash costs to be incurred in the first 3 years after closing*** and of which $588 million have been spent to date.

50. Additionally, defendant Brito made positive statements about Anheuser-Busch's EBITDA growth and dividend payments, stating, in pertinent part:

> EBITDA grew by 13.4% with margin expansion of 288 bps to 39.1%. The U.S. was a strong contributor to EBITDA this year with growth of 1.9% and margin expansion of 159 bps to 41.2%. Additionally, the U.S. gross profit margin expanded for the eighth straight year, growing 66 bps to 61.4%. Normalized earnings per share increased by 42.8% on a reported basis to $4.04 from $2.83 mainly driven by a higher profit.
>
> Lastly, the board has proposed a final dividend of EUR 2 per share for fiscal year 2017, bringing the total dividend for the year to EUR 3.60, in line with the prior year.

51. The statements referenced above in ¶¶41-50 were materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a) that Anheuser-Busch could not grow or maintain its dividend and still meet its stated deleveraging targets and avoid having its credit ratings downgraded;

(b) that Anheuser-Busch was not in fact on track with the Company's stated deleveraging targets without taking drastic measures, including cutting the dividend;

(c) that the devaluation of key emerging market currencies and input cost inflation were having a material adverse effect on the Company's margins, EBITDA and profitability;

(d) that the Company's liquidity and cash flow levels were not in fact sufficient to achieve modest short term dividend growth, or at a minimum maintain its then-current dividend, as promised; and

(e) that as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company's then-current business operations and future financial prospects, including dividend growth, liquidity, currency risk, cost synergies, and Defendants' then-current efforts to deleverage Anheuser-Busch's balance sheet.

52. On March 19, 2018, Anheuser-Busch filed with the SEC the Form 20-F, which was certified by defendants Brito and Dutra and amended on April 4, 2018. Form 20-F required the

Company to disclose those most significant factors that make investment in the Company's securities speculative or risky.

53. In this regard, the Form 20-F made reference to potential "risks" to the Company's ADSs and associated with the Company's payment of dividends when, in fact, Defendants knew or recklessly ignored that Anheuser-Busch was not going to be able to maintain or grow its then-current dividend and still meet its deleveraging targets, stating, in pertinent part, as follows:

> ***We may be unable to pay dividends***.
>
> As a general matter, we cannot guarantee that we will pay dividends in the future. ***The payment of dividends will depend on factors such as our business outlook, cash flow requirements and financial performance, the state of the market and the general economic climate*** and other factors, including tax and other regulatory considerations. In particular, in light of the increased debt that resulted from completion of the combination with SAB, deleveraging remains a priority and ***may restrict*** the amount of dividends we are able to pay. In addition, we must, under Belgian law and our articles of association, before we proceed with any dividend payment, allocate an amount equal to 5% of our annual net profit on an unconsolidated basis to a legal reserve in our unconsolidated financial statements until the reserve reaches 10% of our share capital, in accordance with Belgian accounting principles.[6]

54. In addition, Item 5 of Form 20-F required Anheuser-Busch to provide a description of the internal and external sources of liquidity and include a statement indicating whether the Company's working capital is sufficient for its present requirements, or, if not, how it proposes to provide the necessary additional working capital. The Company's Form 20-F misleadingly reassured investors that Anheuser-Busch had ample liquidity to satisfy its obligations, including its dividend payments, stating, in pertinent part, as follows:

> ***We are of the opinion that our working capital, as an indicator of our ability to satisfy our short-term liabilities, is based on our expected cash flow from operations for the coming 12 months, sufficient for the 12 months following the date of this Form 20-F. Over the longer term, we believe that our cash flows from operating activities, available cash and cash equivalents and short-term***

[6] First emphasis in original.

***investments, along with our derivative instruments and our access to borrowing facilities, will be sufficient to fund our capital expenditures, debt service and dividend payments going forward***. As part of our cash flow management, we manage capital expenditures by optimizing use of our existing brewery capacity and standardizing operational processes to make our capital investments more efficient. We are also attempting to improve operating cash flow through procurement initiatives designed to leverage economies of scale and improve terms of payment to suppliers.

* * *

We expect the portion of our consolidated balance sheet represented by debt to remain significantly higher as compared to former AB InBev's historical position. Our level of debt could have significant consequences, including:

- increasing our vulnerability to general adverse economic and industry conditions;
- limiting our ability to fund future working capital and capital expenditures, to engage in future acquisitions or development activities or to otherwise realize the value of our assets and opportunities fully;
- limiting our flexibility in planning for, or reacting to, changes in our business and the industry in which we operate;
- impairing our ability to obtain additional financing in the future, or requiring us to obtain financing involving restrictive covenants;
- requiring us to issue additional equity (possibly under unfavorable conditions), which could dilute our existing shareholders' equity; and
- placing us at a competitive disadvantage compared to our competitors that have less debt.

55. The Form 20-F also falsely represented that Anheuser-Busch's disclosure controls were operating effectively, stating, in pertinent part, as follows:

**Disclosure Controls and Procedures**

Our management, with the participation of our Chief Executive Officer and Chief Financial & Technology Officer, has evaluated the effectiveness of the design and operation of our disclosure controls and procedures pursuant to Exchange Act Rule 13a-15(b) as of 31 December 2017. While there are inherent limitations to the effectiveness of any system of disclosure controls and procedures, including the possibility of human error and the circumvention or overriding of the controls and procedures, our disclosure controls and procedures are designed to provide reasonable assurance of achieving their objectives. Based upon our evaluation, as of

> 31 December 2017, the Chief Executive Officer and Chief Financial & Technology Officer have concluded that the disclosure controls and procedures, in accordance with Exchange Act Rule 13a-15(e), (i) are effective at that level of reasonable assurance in ensuring that information required to be disclosed in the reports that are filed or submitted under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Commission's rules and forms, and (ii) are effective at that level of reasonable assurance in ensuring that information to be disclosed in the reports that are filed or submitted under the Exchange Act is accumulated and communicated to the management of our company, including the Chief Executive Officer and the Chief Financial & Technology Officer, to allow timely decisions regarding required disclosure.

56. Additionally, the Form 20-F misleadingly represented that the Company's hedging policies managed "foreign currency risks to protect [the Company's] exposure to" foreign currencies, stating, in pertinent part, as follows:

> ***We also have hedge policies designed to manage commodity price and foreign currency risks*** to protect our exposure to currencies other than our operating companies' respective functional currencies.

57. The statements referenced above in ¶¶53-56 were materially false and misleading when made for the reasons stated above in ¶51. Additionally, the statements referenced above in ¶¶53-56 were materially false and misleading because Defendants' "risk" disclosures misrepresented and failed to disclose that there was a ***substantial*** likelihood that Anheuser-Busch would in fact be unable to grow or maintain its dividend and still meet its deleveraging targets, and because Anheuser-Busch's disclosure controls were not in fact effective for the reasons stated above in ¶51. Moreover, the statement in ¶53 above that "deleveraging remains a priority and may restrict the amount of dividends we are able to pay" was materially false and misleading because it was the same boilerplate risk disclosure that the Company had provided in its Form 20-F since 2015, even ***before*** the Company's 2016 combination with SABMiller. This boilerplate language did not reflect the reality that the Company would need to slash its dividend.

58. On May 9, 2018, Anheuser-Busch issued a press release announcing its financial results for the 2018 first quarter, the period ended March 31, 2018. The press release reiterated that

dividends would grow over time, despite modest short term growth, stating, in pertinent part, as follows:

> ***We continue to expect dividends to be a growing flow*** over time, although ***growth in the short term is expected to be modest*** given the importance of deleveraging.

59. The May 9 press release also highlighted the Company's EBITDA growth, the successful integration of SABMiller and the cost synergies related thereto, stating, in pertinent part, as follows:

> Organic EBITDA grew by 6.6% with margin expansion of 70 bps to 38.2%. This result was driven by our revenue delivery and continued synergy capture, though partially offset by the phasing of sales and marketing initiatives ahead of the FIFA World CupTM, as flagged during our FY17 results.
>
> * * *
>
> The business integration [of SABMiller] is progressing well, with synergies and cost savings of 160 million USD captured during 1Q18.

60. Along with the 2018 first quarter earnings press release, Anheuser-Busch issued a quarterly report presentation, stating, in pertinent part, that dividends would be "a growing flow over time," albeit that "dividend growth [was] expected to be modest," as reflected in the following slide:



61. Later that day, Anheuser-Busch held a conference call with analysts and investors to discuss the Company's earnings release and business. During the Q&A session of the conference call, defendant Dutra reassured investors that the Company's net debt-to-EBITDA ratio historically increases during the first half of the year as cash flow generation is typically stronger in the second half of the year and that the Company's capital allocation remained unchanged, with dividends growing over time, responding, in pertinent part, to the question below as follows:

> **Mark David Swartzberg** - *Stifel, Nicolaus & Company, Incorporated, Research Division - MB*
>
> Felipe, a few cash flow questions. We didn't get a net debt figure in the release. But based on your deck, it looks like net debt was about $100 billion at the end of March. So can you give us that number? And then more importantly, can you speak to your outlook for free cash flow growth this year and the scope for a dividend increase later this year?
>
> **Felipe Dutra** – *Anheuser-Busch InBev SA/NV – Chief Financial & Technology Officer and Member of the Executive Management Board*
>
> Okay. So in terms of debt and cash flow balance sheet, we do not publish on a quarterly basis. However, it is clear that due to seasonality, ***our cash flow generation is much stronger in the second half*** as dividends are more concentrated in the first half as well as some certain tax payments as well as CapEx investments. So ***historically, cash flow is much stronger in the second half as compared to the first half. So that impacts our net debt-to-EBITDA upwards during the first half before it goes down in the second half of the year***. In terms of cash flow generation, deleveraging remains our priority and ***capital allocation remains unchanged***. ***We see dividends as a growing flow over time.*** However, in the short term, we don't see much room for that given the leverage levels. But in terms of cash flow generation, the fact that we are already in the negative territory, that is as we grow revenues, that helps to release funds from invested capital, and we continue to work to improve core working capital as a percentage of net revenues not only in the former ABI but also in the former SAB as part of the synergies not quantified in the $3.2 billion.

62. Additionally, defendant Dutra highlighted the cost synergies associated with the acquisition of SABMiller, stating, in pertinent part, as follows:

> ***In the first quarter, we delivered $160 million of synergies, bringing the total synergies captured to date to almost $2.3 billion. Our total synergy guidance remains at $3.2 billion to be delivered within the 4-year period*** following the close of the combination. This number is inclusive of the $1.05 billion of cost savings

> previously identified by SAB. As a reminder, these synergies do not include any top line or working capital synergies. We continue to expect the synergy capture to require approximately $1 billion of one-off cash costs to be incurred in the first 3 years after closing and of which $640 million has been spent to date.

63. Dutra also noted during the conference call that management was actively and, apparently, successfully managing Anheuser-Busch's debt maturities, and that its optimal net debt-to-EBITDA ratio and capital allocation objectives remained unchanged, stating, in pertinent part, as follows:

> So we continue to actively manage our debt portfolio to optimize maturities, coupons and currency mix. This quarter, we had 2 issuances: a euro offering with a 9-year weighted average maturity and a weighted average coupon of 0.9%, and a U.S. dollar offering with a weighted average maturity of 20 years and a weighted average coupon of 4.2%. These issuances were primarily used to repay most of the near-term maturities in 2019 and 2020, as you can see from Slide 23. ***Our optimal capital structure remains a net debt-to-EBITDA ratio of around 2x, and our capital allocation objectives remain unchanged*** . . . .

64. The statements referenced above in ¶¶58-63 were materially false and misleading when made for the reasons stated above in ¶51, and because Defendants knew or were reckless in not knowing that the Company would significantly reduce its dividend.

65. On July 26, 2018, Anheuser-Busch issued a press release announcing its financial results for the 2018 second quarter, the period ended June 30, 2018. The press release again highlighted the Company's expected growth acceleration in the second half of 2018 and expected dividend growth over time, including modest short term growth, as follows:

> ***We continue to expect our growth to accelerate in the second half of this year*** as we scale up learnings from the category expansion framework and continue to share best practices across our markets.
>
> * * *
>
> ***We continue to expect dividends to be a growing flow over time, although growth in the short term is expected to be modest*** given the importance of deleveraging.

66. The July 26, 2018 press release also stated the Company's debt and deleveraging status, EBITDA growth, and the successful integration of SABMiller and the cost synergies related thereto, stating, in pertinent part, as follows:

> ***EBITDA grew this quarter by 7.0%*** with margin expansion of 85 bps to 39.7%. This was driven by topline growth, premiumization, enhanced synergy capture and effective cost management, though partially offset by higher sales and marketing investments ahead of the 2018 FIFA World Cup RussiaTM, as expected. ***Our integration with SAB continues to go as planned with synergy capture and cost savings of 199 million USD in the quarter***.
>
> Our net debt increased from 104.4 billion USD as of 31 December 2017 to 108.8 billon USD as of 30 June 2018, consistent with prior increases in the first half of the year, given that the majority of our cash flow is generated in the second half of the year. Our net debt to normalized EBITDA ratio increased from 4.80x as of 31 December 2017 to 4.87x as of 30 June 2018, as a result of our cash flow seasonality and ***adverse currency fluctuations*** in our EBITDA translation. ***Deleveraging to around 2x remains our commitment, and we remain on track in our deleveraging path***.

67. Along with the 2018 second quarter earnings press release, Anheuser-Busch issued a quarterly report presentation, stating, again in pertinent part, that dividends will be "a growing flow over time," albeit that "dividend growth [was] expected to be modest":

## Capital Allocation objectives

Our **optimal capital structure** is a Net Debt/EBITDA ratio of approximately 2x.

The priorities for the use of cash are as follows:

1. **Organic growth:** Investing in the organic growth of our business
2. **Deleveraging:** Deleveraging to around the 2x level remains our commitment
3. **Selective M&A:** Non-organic, external growth is a core competency and we will continue to consider suitable opportunities when and if they arise, subject to our strict financial discipline and deleveraging commitment
4. **Return of cash to shareholders:** Our goal is for dividends to be a growing flow over time in line with the non-cyclical nature of our business. Given the importance of deleveraging, dividend growth is expected to be modest.

ABInBev © AB InBev 2018 – All rights reserved 23

68. Also on July 26, 2018, Anheuser-Busch held a conference call with analysts and investors to discuss the Company's earnings release and business. During the call, defendant Dutra reassured investors about the Company's deleveraging efforts, noting they were "***on track***" with internal targets, stating, in pertinent part, as follows:

> Our net debt increased from $104.4 billion as of December 31 to -- 2017 to $108.8 billion as of June 30, 2018. The increase in our net debt is consistent with prior increases in the first half of the year given that the majority of our cash flow is generated in the second half of the year, as you'll see on Slide 23.
>
> Our net debt to EBITDA ratio increased from 4.8 as of December 31, '17, to 4.87 as of June 30, 2018, as a result of an increase in our net debt as well as a adverse currency fluctuations in our EBITDA translation.
>
> ***We'll continue to proactively manage our debt portfolio, of which 93% holds a fixed interest rate, 42% is denominated in currencies other than the U.S. dollar, and maturities are well distributed across the next several years***.
>
> ***Deleveraging around 2x remains our commitment. We remain on track in our deleveraging path***, and we will prioritize debt repayment in order to meet this objective. As you can see on Slide 24, ***our capital allocation objectives remain unchanged***.

69. During the Q&A session of the conference call, defendant Dutra reiterated that the Company's deleveraging efforts were "on track" with internal targets, attempted to mitigate the currency (referred to as "FX") risk and emphasized that Anheuser-Busch had "***plenty of cash***" to satisfy its obligations, stating, in pertinent part, as follows:

> [A]s EBITDA accelerates and as you have seen that, historically, second half cash flow generation accounts for 65% to 75% of total full year cash flow generation, ***we do expect second half cash flow generation to be much stronger on the higher end of this range***, also due to some technical issues that caused cash taxes in the first half of this year payments to be higher than prior years. That said, ***our optimal capital structure levels points to a net debt to EBITDA around 2x, and we remain on track to delever to that point***. And also, as we think about debt profile in currencies overall, you have also to account to the fact that ***we have a benefit mix of currencies that mitigates the FX risk***. 22% of our debt is in currencies other than U.S. dollars, and then you also have to account for the translation of the EBITDA figure into U.S. dollars. Nevertheless, maturities are well distributed. We have an average duration of over 12 years and ***only $2 billion coming due in 2018 and '19, which is basically nothing*** in comparison to our numbers. And ***in terms of interest rates, again, 92%***

> ***of that is fixed at very favorable level.  And liquidity levels also stay around $17 billion, which is plenty of cash, more than we will actually need in the coming years.  So we remain on track to deleveraging in approximately half a turn of net debt-to-EBITDA reduction per year through the combination of EBITDA growth, as I said, as well as debt paydown.***

70. The statements referenced above in ¶¶65-69 were materially false and misleading when made for the reasons stated above in ¶51, and because Defendants knew or were reckless in not knowing that the Company would significantly reduce its dividend. Additionally, the statement referenced above in ¶69 that the Company had "plenty of cash" to remain on track to deleveraging was false and misleading because Defendants were not in fact on track to deleveraging in accordance with Defendants' stated targets despite Defendants' purported high liquidity levels.

71. From August 7, 2018 through August 9, 2018, Anheuser-Busch held its 2018 investor seminar. On the last day of the seminar, August 9, 2018, defendant Dutra gave a presentation to investors during which he emphasized the strength of the Company's financial position in 2018 as compared to in 2008, when Anheuser-Busch cut the dividend:

> Our financial position today is very strong***.  Compared to our company at the time of the AB combination in 2008, we have almost doubled our EBITDA, our debt is much cheaper and longer dated, we enjoy a significantly larger liquidity cushion, have limited short-term refinancing needs, and - unlike in 2008 - we do not have any financial covenants.***

72. Dutra supported his statements about the strength of the Company now, as compared to 2008, with the following slide, in which he also emphasized the Company's financial position as "far stronger than it was during the Anheuser-Busch combination" in 2008:




73. Dutra also presented slides to investors illustrating how the Company "dramatically enhanced [its] global scale and diversification" from 2008 to 2017, and emphasizing the world economic outlook "was more bearish in 2008 than it is today":






74. Significantly, and immediately following the slides and comments referenced in ¶¶71-73 above, Dutra assured investors that "*no drastic measures were required* for us to deleverage as a result of the SAB combination," and issued a slide to investors explaining how the Company's current "path to deleveraging is different today than it was in 2008," when InBev acquired Anheuser-Busch and the Company had to cut its dividend, and noted, in pertinent part:

> ***Because both our company and the global economy are in a healthier position today than they were during the AB combination, our path to deleveraging is also different than it was in 2008. No drastic measures were required for us to deleverage as a result of the SAB combination***. While economic and FX headwinds in certain markets may impact our results from time to time, the fundamentals of our business are strong. ***Unlike in 2008, we have ample liquidity and access to deep and liquid capital markets around the globe***. We have retained the flexibility to invest in the long-term future of our business while also employing our core strengths to maximize cash flow generation and deleverage to around 2x.

75. Dutra supported these statements about the strength of the Company and the "***different***" path to deleveraging following the SABMiller combination, as compared to following the InBev and Anheuser-Busch combination in 2008 when the Company cut its dividend, with the following slide that ***specifically emphasized that a dividend cut was required as a measure for deleveraging in 2008*** when circumstances were vastly different than in 2018:




(Arrow and highlighting of "Dividend cut" added.)

76. Additionally, Dutra emphasized in his presentation that Anheuser-Busch's "***risk management framework is designed to address embedded [currency] volatility*** associated with [the Company's] global footprint" and "focuses on debt composition to counterbalance EBITDA FX volatility," as reflected in the following slide:



77. Defendant Dutra also emphasized that Anheuser-Busch's debt maturity profile provided it with "significant flexibility" and that the Company had a "comfortable liquidity position of 16.9 billion dollars," stating, in pertinent part, as follows:

> ***Our debt maturity profile provides us with significant flexibility. At the end of 2016, we had 43.3 billion dollars of debt maturing between 2018-2021.***
>
> ***Fast-forward to today, we have reduced the short-term maturity by more than half to a manageable 20.6 billion dollars due between now and 2021. We have a comfortable liquidity position of 16.9 billion dollars***, composed of nearly 8 billion dollars of cash and a 9 billion dollar revolving credit facility, which far exceeds even our largest yearly maturity.

78. The statements referenced above in ¶¶71-77 were materially false and misleading when made for the reasons stated above in ¶51, and because Defendants knew or were reckless in not knowing that the Company would significantly reduce its dividend. Additionally, the statements referenced above in ¶¶71-75 were materially false and misleading because Defendants' assertions that the Company's financial position is "stronger" and path to deleveraging is "different" than in 2008 when Anheuser-Busch implemented a "dividend cut" following the combination of InBev and Anheuser-Busch gave investors and analysts the false impression that the Company would ***not*** cut dividends imminently.

79. Shortly thereafter, on October 25, 2018, when Anheuser-Busch announced its financial results for the quarter and nine month periods ended September 30, 2018, the Company announced that it had slashed its dividend by ***50%*** to "accelerate deleveraging toward our optimal capital structure of around a 2x net debt to EBITDA ratio . . . .", stating, in pertinent part, as follows:

> ***Consistent with these long-standing capital allocation priorities and in light of recent currency volatility, we are rebasing our dividend payout to accelerate deleveraging toward our optimal capital structure of around a 2x net debt to EBITDA ratio*** while continuing to prioritize investment in organic growth opportunities and creating greater financial flexibility.

* * *

> ***Following this rebase of 50%***, we expect dividends to be a growing flow over time in line with the non-cyclical nature of our business. However, growth in the short term is expected to be modest given the importance of deleveraging.

80. Defendant Dutra reiterated these same statements during an October 25, 2018 conference call that Anheuser-Busch held with analysts and investors to discuss the Company's earnings release and business. He also stated that "[t]he rebase of the dividend will release roughly $4 billion of additional cash per year to accelerate deleveraging, which is expected to maximize our total enterprise value as a result of lower cost of capital." And *Reuters* reported that same day that Dutra further explained Defendants' decision to cut the dividend as follows: "'***In the last six months, we've seen a lot of (currency) volatility. This scenario triggers some sort of uncertainty and at a certain point . . . we thought it was the right time to adjust the dividend***.'"

81. In response to this news, the price of Anheuser-Busch ADSs declined approximately 9.5%, from $82.25 per ADS to $74.54 per ADS, eliminating approximately ***$15 billion*** of the Company's market capitalization on heavy trading volume.

82. The market for Anheuser-Busch ADSs was open, well-developed and efficient at all relevant times. As a result of the alleged materially false and/or misleading statements, and/or omissions of material fact alleged herein, Anheuser-Busch ADSs traded at artificially inflated prices during the Class Period. Lead Plaintiff and other members of the Class purchased Anheuser-Busch ADSs relying upon the integrity of the market price of Anheuser-Busch ADSs and market information relating to Anheuser-Busch, and have been damaged thereby.

83. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Anheuser-Busch ADSs, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. These statements and omissions were materially false and misleading in that

they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

84. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Lead Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Anheuser-Busch's business, deleveraging efforts and its supposed plan to maintain or even "grow" the Company's dividend. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Anheuser-Busch, its business, liquidity and financial prospects, thus causing the Company's ADSs to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Lead Plaintiff and other members of the Class purchasing the Company's ADSs at artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

85. As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Anheuser-Busch, their control over, and/or receipt and/or modification of Anheuser-Busch's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Anheuser-Busch, participated in the fraudulent scheme alleged herein.

86. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants. Given their executive level positions with Anheuser-Busch, the Individual Defendants controlled the contents of Anheuser-Busch's public statements during the Class Period. The Individual Defendants were each provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. As a result, each of the Defendants was responsible for the accuracy of Anheuser-Busch's corporate statements and is, therefore, responsible and liable for the representations contained therein.

87. Lead Plaintiff also alleges that the facts at issue related to the core operations of Anheuser-Busch, and thus were logically known by the CEO and Chief Financial and Solutions Officer of the Company, each of whom is an Individual Defendant. In fact, the "return of cash to shareholders" and "deleveraging" were two of the Company's four key capital allocation objectives repeatedly identified by Defendants in press releases, reports and conference calls throughout the Class Period. The centrality of the Anheuser-Busch dividend to the value and price of Anheuser-Busch ADSs further supports and strengthens the inference of scienter. Before the end of the Class Period, Anheuser-Busch maintained a dividend yield of 4.8% – well above the 2.5-3.5% range of most large consumer staples companies. Indeed, analysts' in-depth discussions of the Anheuser-Busch dividend further establishes the fundamental importance of the dividend to investors and the

market. Given the sheer size and importance of the dividend to the Company's ability to attract investors, it is implausible that defendants Dutra and Brito were unaware of Defendants' intention to cut the dividend.

88. Moreover, the Individual Defendants' familiarity with the purported financial measures impacting their decision to cut the dividend is evident from their assurances during the Class Period that: (1) the Anheuser-Busch dividend would grow modestly in the short term; (2) the Company was "tracking in line" to deleverage to its optimal capital structure levels; (3) the Company's cash flow generation was projected to be much stronger in the second half of the year; (4) the Company's currency profile mitigated any currency risk; and (5) the Company's financial position was far stronger than in 2008 when it cut the dividend following the Anheuser-Busch-InBev combination (including benefiting in 2018 from a "significantly larger liquidity cushion" and "limited short-term refinancing needs"). For example, as detailed herein, defendant Brito made statements during the Class Period about Anheuser-Busch's strong EBITDA growth and the maintenance of dividend payments, while defendant Dutra made statements about the Company's dividend growth, net debt-to-EBITDA ratio, deleveraging efforts, synergies from the SABMiller combination, cash flow generation, liquidity levels, currency profile and financial positioning. Specifically, Dutra stated repeatedly that dividend growth, albeit modest, would continue, that the Company had "plenty of cash" to satisfy its obligations and that Anheuser-Busch's debt profile and currency mix protected the Company from currency risk. Given the Individual Defendants' demonstrated familiarity with the Company's financial metrics, deleveraging efforts and dividend prospects, it is inconceivable and illogical that they would not have known about the dividend cut.

89. In addition, Defendants' scienter is underscored by the Sarbanes-Oxley-mandated certifications of defendants Brito and Dutra, which acknowledged their responsibility to investors for

establishing and maintaining controls to ensure that material information about Anheuser-Busch was made known to them and that the Company's disclosure-related controls were operating effectively. Specifically, the Individual Defendants certified on March 19, 2018 – pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 – that the Company's Form 20-F report: (1) did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading . . ."; and (2) fairly presented "in all material respects the financial condition, results of operations and cash flows of the Company . . ." The Individual Defendants also certified that they "[d]esigned [the] disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under [their] supervision, to ensure that material information relating to the Company . . . is made known" to them, and certified that they "[e]valuated the effectiveness of the Company's disclosure controls and procedures" and presented their "conclusions about [their] effectiveness . . ." These certifications further demonstrate that the Individual Defendants' either knew of or certainly should have known of the wrongdoing alleged herein.

**LOSS CAUSATION**

90. As detailed herein, during the Class Period, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Anheuser-Busch ADSs. This scheme operated as a fraud or deceit on Class Period purchasers of Anheuser-Busch ADSs by failing to disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Anheuser-Busch ADSs declined significantly as the prior artificial inflation was removed from the Company's ADS price.

91. By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of Anheuser-Busch's business, prospects and operations. Defendants' false and

misleading statements had the intended effect and caused Anheuser-Busch ADSs to trade at artificially inflated levels throughout the Class Period, reaching as high as $117.06 per ADS on March 12, 2018. As a result of their purchases of Anheuser-Busch ADSs at artificially inflated prices during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

92. When the truth about the Company was revealed to the market, the price of Anheuser-Busch ADSs fell significantly. This decline removed the inflation from the price of Anheuser-Busch ADSs, causing real economic loss to investors who had purchased Anheuser-Busch ADSs during the Class Period. The decline in the price of Anheuser-Busch ADSs as the corrective disclosure came to light was a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price decline in Anheuser-Busch ADSs negates any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct. Indeed, analysts at the time placed substantial significance on Defendants' dividend cut as the major news from Defendants' October 25, 2018 disclosure, stating that "[e]verything [was] overshadowed by the material dividend cut" and that "the reason for much of the stock's 10% sell-off today . . . was that management slashed the dividend in half . . ." And media reports similarly recognized that the stock drop was caused by the dividend cut, as evidenced in the October 25, 2018 *Bloomberg* article entitled, "Anheuser-Busch InBev Watches Its Market Value Plunge by $18 Billion After It Cuts Its Dividend in Half."

93. The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of

Anheuser-Busch ADSs and the subsequent significant decline in the value of Anheuser-Busch ADSs when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

**APPLICABILITY OF PRESUMPTION OF RELIANCE:
FRAUD ON THE MARKET DOCTRINE**

94. At all relevant times, the market for Anheuser-Busch ADSs was an efficient market for the following reasons, among others:

(a) Anheuser-Busch ADSs met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient, national stock market;

(b) as a regulated issuer, Anheuser-Busch filed periodic public reports with the SEC and the NYSE;

(c) Anheuser-Busch regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Anheuser-Busch was generally followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. These reports were publicly available and entered the public marketplace.

95. As a result of the foregoing, the market for Anheuser-Busch ADSs promptly digested current information regarding Anheuser-Busch from all publicly available sources and reflected such information in the prices of the ADSs. Under these circumstances, all purchasers of Anheuser-Busch ADSs during the Class Period suffered similar injury through their purchase of Anheuser-Busch ADSs at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

96. The statutory safe harbor provided for forward-looking statements under Private Securities Litigation Reform Act of 1995 does not apply to any of the allegedly false statements plead in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not adequately identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because Defendants' verbal safe harbor warnings accompanying their oral forward-looking statements issued during the Class Period were ineffective to shield those statements from liability, and/or the forward-looking statements were authorized or approved by an executive officer of Anheuser-Busch who knew that the statements were false when made.

## CLASS ACTION ALLEGATIONS

97. This is a class action on behalf of all purchasers of Anheuser-Busch ADSs during the Class Period, who were damaged thereby (the "Class"). Excluded from the Class are Defendants and their immediate families, the Company's officers and directors at all relevant times, as well as their immediate families, Defendants' legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

98. The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable. Anheuser-Busch ADSs were actively traded on the NYSE. Record owners and other members of the Class may be identified from records maintained by Anheuser-Busch or its transfer agent and may be notified of the pendency of this action by mail, using the form

of notice similar to that customarily used in securities class actions. While the exact number of Class members is unknown to Lead Plaintiff at this time, Lead Plaintiff reasonably believes there are thousands of members in the proposed Class.

99. Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

100. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

101. Common legal and factual questions exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the 1934 Act was violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Anheuser-Busch;

(c) whether the price of Anheuser-Busch ADSs was artificially inflated during the Class Period; and

(d) to what extent the members of the Class have sustained damages and the proper measure of damages.

102. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule l0b-5 Promulgated Thereunder Against All Defendants

103. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

104. During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

105. Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company ADSs during the Class Period.

106. Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Anheuser-Busch ADSs. Lead Plaintiff and the Class would not have purchased Anheuser-Busch ADSs at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' false and/or misleading statements.

107. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of Anheuser-Busch ADSs during the Class Period.

**COUNT II**

**Violation of Section 20(a) of The Exchange Act
Against the Individual Defendants**

108. Lead Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

109. The Individual Defendants acted as controlling persons of Anheuser-Busch within the meaning of Section 20(a) of the Exchange Act. By virtue of their positions as officers of Anheuser-Busch, and/or their ownership of Anheuser-Busch ADSs, the Individual Defendants had the power and authority to, and did, cause Anheuser-Busch to engage in the wrongful conduct alleged.

110. As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of Anheuser-Busch ADSs during the Class Period.

111. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiff, on behalf of itself and the Class, prays for judgment as follows:

A. Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Lead Plaintiff as a class representative and Lead Plaintiff's counsel as Lead Counsel;

B. Declaring that Defendants are liable pursuant to the 1934 Act;

C. Awarding Lead Plaintiff and other members of the Class damages together with interest thereon;

D. Awarding Lead Plaintiff and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, expert fees and other costs and disbursements; and

E. Awarding Lead Plaintiff and other members of the Class such other and further relief as the Court deems just and proper under the circumstances.

**JURY TRIAL DEMANDED**

Lead Plaintiff hereby demands a trial by jury.

DATED: December 12, 2019

ROBBINS GELLER RUDMAN
& DOWD LLP
CHAD JOHNSON
NOAM MANDEL

*/s/ Chad Johnson*
CHAD JOHNSON

125 Park Avenue, 25th Floor
New York, NY 10017
Telephone: 212/791-0567
Fax: 619/231-7423
chadj@rgrdlaw.com
noam@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
VINCENT M. SERRA
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
vserra@rgrdlaw.com

*Lead Counsel for Lead Plaintiff*

**CERTIFICATE OF SERVICE**

I, Chad Johnson, hereby certify that on December 12, 2019, I authorized a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.

*/s/ Chad Johnson*
CHAD JOHNSON