K9OQabiO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

In Re:  ANHEUSER-BUSCH INBEV
SA/NV SECURITIES LITIGATION,

                                        19 Civ. 5854 (AKH)
                                        Remote Oral Argument

------------------------------x

                                        New York, N.Y.
                                        September 24, 2020
                                        2:30 p.m.

Before:

                HON. ALVIN K. HELLERSTEIN,

                                        District Judge

                        APPEARANCES

ROBBINS GELLER RUDMAN & DOWD LLP
      Attorneys for Plaintiffs
BY:  CHRISTOPHER CHAD JOHNSON
      NOAM N. MANDEL
      VINCENT M. SERRA
      DESIREE CUMMINGS

SULLIVAN & CROMWELL LLP
      Attorneys for Defendants
BY:  BRIAN T. FRAWLEY
      MATTHEW J. PORPORA
      LEONID TRAPS

ALSO PRESENT:  JAY TURNER, City of Birmingham
                MARK SHELLEY, Anheuser-Busch

K9OQabiO

(The Court and all parties appearing telephonically)

THE COURT:  This is Judge Hellerstein.  Good afternoon.

DEPUTY CLERK:  We have a court reporter on.  It's Alena.  I think we should be ready to go.  Hello.

THE COURT:  Yes.  So is Chad Johnson here?

MR. JOHNSON:  Good afternoon, your Honor.  Yes, I am.

THE COURT:  And your colleague, Noam Mandel.

MR. JOHNSON:  Exactly.  And Vince Serra and Desiree Cummings are on with me.

We also have a client representative on the line, your Honor.  That is Mr. Jay Turner with the Office of the City Attorney for the City of Birmingham.

THE COURT:  Good afternoon, all.

I take it, Mr. Johnson, you will be the spokesperson?

MR. JOHNSON:  Yes, your Honor, with your permission.

THE COURT:  For defendants, we have Brian Frawley of Sullivan & Cromwell.

MR. FRAWLEY:  Yes, your Honor.  Hi.  Thank you.

THE COURT:  Matthew Porpora of Sullivan & Cromwell?

MR. PORPORA:  Yes, your Honor.  Good afternoon.

THE COURT:  And Leonid Traps of Sullivan & Cromwell.

MR. TRAPS:  Yes, your Honor.  Good afternoon.

THE COURT:  I take it, Mr. Frawley, you will be the speaker.

K9OQabiO

MR. FRAWLEY: Yes, your Honor. It's Brian Frawley. I will be the speaker, and Mark Shelley, the Global Director of Litigation from Anheuser-Busch is also on the line.

THE COURT: Good afternoon all.

Mr. Frawley, it's your motion, you begin.

MR. FRAWLEY: Thank you, your Honor.

As the Court is aware, we're here on defendant's motion to dismiss the case in its entirety and with prejudice under Rules 9(b) and 12(b)(6), as well as the Private Securities Litigation Reform Act. The Court is aware the defendants here, Anheuser-Busch InBev, which we refer to in the papers as ABI, and it's Chief Executive Officer and then Chief Financial Officer, Carlos Brito and Felipe Dutra. There has been extensive briefing here, which I'm sure was a lot for your Honor to get through, so I'm not going to repeat much of what is in the papers, and I'm happy to answer any questions as we get through this.

Some very brief background and I'll get right to the arguments. As securities cases go, this is an exceedingly simple matter and an unusually bare pleading. The case concerns two-quarters worth of ABI's financial results between March and October 2018. While the plaintiff says this case is about half-truth issues by defendants, that argument is half true. The half-truth here appear in plaintiff's pleading and its opposition which contorts substantially what are simple

K9OQabiO

and, we submit, faulty fraud theories.

The defendant's statements have not at all been pled with particularity that is required to establish them to be untrue or misleading, much less with the high degree of fraudulent intent that is required by the Private Securities Litigation Reform Act.

As I mentioned, the facts here we think are quite simple. Following its 2016 acquisition of SAB Miller, ABI disclosed repeatedly to its investors its objective to decrease the company's overall leverage as measured by its so-called leverage ratio, which is the ratio of the company's overall net debt to what is referred to as EBITDA -- which is cap E-B-I-T-D-A for the court reporter -- Earnings Before Interest, Taxes, Depreciation and Amortization.

To give an oversimplified example, that ratio means that if ABI had $10 worth of debt and $5 worth of cash on hand, its net debt was $5. And, likewise, if it's EBITDA was $1 during the period, it would have a leverage ratio of five to one or 5.0 as the papers describe. So pretty simple.

ABI repeatedly told investors its objective -- and that was the word it used *objective* -- was to reduce its leverage ratio to its optimal capital structure of 2.0. ABI said it hoped to accomplish this deleveraging in increments of about a half a point a year. So, put differently, this deleveraging goal of reducing its leverage ratio from where it

K9OQabiO

stood at about 5.5 in 2016 to ultimately 2.0, meant this goal wouldn't be achieved for seven or eight years, or sometime in 2024.

Naturally, you can't grow earnings or reduce debt without cash.  Yet, an inherent feature of the beer business is that cash flows are heavily weighted to the second half of the year.  As the complaint concedes at paragraph 69, as much as 75 percent of ABI's full year cash flows are generated in the second half of the year when cash comes in.  This means that ABI's leverage ratio naturally increases in the first half of the year, and any deleveraging can only happen in the second half of the year as cash grows.  It also means that the level of available cash to service debt or pay dividends in any year depends overwhelmingly on third and fourth quarter financial results.

With these basic concepts in mind I'm going to turn to the claims here.  Plaintiff challenges statements on five dates over six months during 2018.  The crux of plaintiff's complaint is the same statements on the same PowerPoint slide that ABI used before, during, and after the class period setting out its "capital allocation objectives."  The slide is reproduced in full at paragraph 46 of the complaint.  It also appears in a number of our exhibits, including Exhibit E at page 37.

The focus by plaintiffs on this slide is quite peculiar because it so fundamentally contradicts their claims.

K9OQabiO

Set forth there in black and white, some other colors too, for all to see was an explanation of ABI's future "objectives" for using available future cash which identified the return of cash to shareholders, i.e., dividends, as the absolute lowest company priority below organic growth, deleveraging, and selective mergers and acquisitions.  ABI described this fourth and lowest dividend objective as entirely aspirational, a "goal for dividends to be a growing flow over time, and given our emphasis on deleveraging, dividend growth is expected to be modest."

In fact, the very same disclosures, the same documents all emphasized that unlike dividend goals, deleveraging was "a commitment," and that ABI would prioritize debt repayment over all other objectives including the dividend.

THE COURT:  I don't know if you can consider commitment in the sense of a contractual commitment or an obligation.  I think commitment here is a goal also. "Deleveraging to around the two-time level remains our commitment" means that our goal is steady.  I read commitment in that sense.

MR. FRAWLEY:  Yes, your Honor, and we agree with that. I was just referring to the fact that in terms of the -- the level of commitment between the priorities, a much stronger word was used in reference to deleveraging compared to a much more aspirational word.

K9OQabiO

THE COURT:  I take your point.  I take your point.

MR. FRAWLEY:  OK.

THE COURT:  Given the priority of goals, deleveraging is more important than dividend growth.

MR. FRAWLEY:  Correct.  And even beyond the aspirational words that we just went over, your Honor, as we point out in our motion and in the papers that are laid out at pages 9 and 10 of the motion -- and I won't go through all of this -- there are a host of other warnings that smothered these disclosures and warned about the aspirational and uncertain nature of them, including statements --

THE COURT:  Well, when one reads this, I think, one reads this, and to use your words "aspirational," let's say a strong aspiration, a stronghold -- a strong goal, subject to the vicissitudes of business, if you have to take care of paying down your debt first, there may not be enough for dividend growth.  There may not be enough for dividends.  And I read the statements in that sense, and I think that is the main point you are making about the lack of scienter and a lack of adequacy of misrepresentation.

MR. FRAWLEY:  Yes, your Honor, you are entirely correct.  And with that common understanding, I'm going to move much further into what I was going to cover because I think we're entirely on the same page.

So, in terms of whether there is a misstatement here,

K9OQabiO

there are two defects, fundamental defects, with a few subparts.  The first is that these dividend statements, as was just alluded to, are not actionable at all.  And then the second is even if they were, the complaint pleads no misleading statement with the particularity that's required.  So let's start with not actionable at all.

The securities laws applied in --

THE COURT:  Meaning that it's not a misrepresentation?

MR. FRAWLEY:  Correct.  That the securities laws, your Honor, apply to statements of fact, but dividend goals are not a statement of fact at all.  In *Omnicare*, the Supreme Court described a fact as follows:  A thing done or existing or an actual happening.

Other courts in this context have described a fact as "a statement that is capable of being proved, right or wrong, at the moment it was spoken."

The only factual aspect of Anheuser-Busch's dividend goals is its statement that it actually had that goal.  And there is no contention here that it didn't.  We submit, your Honor, that's the end of the inquiry.

THE COURT:  The plaintiff's point is that a reader would think that there was a high expectation of dividend growth.  From all that's laid out here -- and there is a lot laid out -- that is the misrepresentation; that we should have enough for dividend growth.  That itself is problematic, but

reading everything I can into what the plaintiff says, I think that's what he's saying.

MR. FRAWLEY:  I think that is what the plaintiff is saying, but the statements that we have a goal for dividends to be a growing flow over time fits squarely within the Court of Appeals decision in *IBM* that says that dividend promise, even a promise is not actionable statement of fact unless it is shown to be – and this is a quote – "a long term guarantee or assurance that dividends will be paid at a specific level and for a foreseeable time."  And this --

THE COURT:  If you need a glass of water, Mr. Frawley, take a moment.

MR. FRAWLEY:  I'm fine.  Thank you, your Honor.

This is the rule that I allude to because a dividend goal or projection doesn't state anything that is factual.

As this Court ruled in *Seadrill*, "Statements predicting future dividends are an actionable statement of corporate optimism."  There is, we submit, not even a remotely serious argument that ABI's dividend goals met the sort of assurance specified by *IBM* that they will be paid at a specific level and over a specified period of time.

THE COURT:  Dividends really are a function of profits and other priorities for the placement of money or the allocation of money.  So, it's a forward-looking statement. It's very difficult to consider it a representation of an

K9OQabiO

existing fact.  That seems to be your point.

MR. FRAWLEY:  It is.  And I --

THE COURT:  I'm getting your points, Mr. Frawley.
Maybe it's time to see what the plaintiffs say, and then I can
come back to you.

MR. FRAWLEY:  OK.  Thank you, your Honor.

THE COURT:  All right.  Mr. Johnson, you're on.

MR. JOHNSON:  Thank you, your Honor.

I would like to step back for a moment to discuss what
this case is about because it is not simply about the company
having dividend goals.  If it were, I acknowledge that would be
a very different case, and it would require a different
analysis.

But, your Honor, this case is about a series of hard
factual statements made by the defendants about how well the
company was positioned so that it could maintain its dividend.
And through this series of factual present tense statements,
defendants conveyed to shareholders the following message:

That under the then-current circumstances, we do not
recommend, and we won't recommend a cut to our dividends.  In
other words, our coveted dividend is not at risk.

And what's key here is that the circumstances did not
change in or around October 2018 when the same defendants
recommended a severe cut to the dividend, but I want to with
your indulgence --

K9OQabiO

THE COURT:  But isn't that a prediction of the stability of profits?

MR. JOHNSON:  Well, your Honor, dividends aren't simply a result of profits.  They are also a determination as to how the company's capital will be used and, again, if all we had in this --

THE COURT:  If a dividend is paid not out of earnings and profits but distribution of capital, it's not really a dividend; it's a distribution.  A dividend by definition almost requires an allocation of earnings and profits.

MR. JOHNSON:  Fair enough, your Honor.

THE COURT:  It may be an accumulation of earnings and profits, an accumulation from previous years, but I think the point made by Mr. Frawley is a very important point that needs comment from you.  It's the fourth priority.

MR. JOHNSON:  Fair enough, your Honor.  That is correct.  No doubt it was one of the four priorities, and it was among those four the lowest, but what matters here is not just that.  It is all of the hard factual statements that the defendants made in this period of time to emphasize that the company could satisfy all of those priorities, including the payment of dividends at the level it had been paying to that point.

THE COURT:  Take me through your complaint, Mr. Johnson.

K9OQabiO

MR. JOHNSON: Sure. So some of the core statements at issue that, again, are about present tense factual matters include the following: March 1, the company proclaimed --

THE COURT: What paragraph?

MR. JOHNSON: Sure, your Honor. Paragraph 45.

The company proclaimed that its diverse debt currency mix is structured to protect against currency risk.

THE COURT: Let me get to that. Just a minute.

MR. JOHNSON: Sure. Sure. Sure. If your Honor is looking at paragraph 45--

THE COURT: Yes, I think it needs explanation. I think your statement, your lead-in to it that "a diverse debt currency mix is structured to protect against currency risk." Currency risk is not the only driver of earnings and profits.

MR. JOHNSON: Clearly, it is not. There are going to be many drivers, and yet what the company is saying is that they have built a brick wall helping to protect the dividend. This is one part of it. This is one brick in the wall.

THE COURT: They don't say brick wall. They say they've got hedges in place that protect against rising interest rates. Rising interest rates increase the difficulty in deleveraging, and the company says, look, we're OK with because we've hedged against rising interest rates.

MR. JOHNSON: That's correct.

THE COURT: "The diverse debt currency mix provides

SOUTHERN DISTRICT REPORTERS, P.C.•••
(212) 805-0300

K9OQabiO

access to global capital markets with deep liquidity."  But all that says is that there is an ability to borrow.  An ability to borrow is not going to help deleveraging unless you reduce the interest rate that you pay, and there is nothing here that says that.  There are a lot of different places where we can go for money.  It doesn't say that because of that, we're able to drive down our interest obligation.

MR. JOHNSON:  Well, your Honor --

THE COURT:  Putting two and two together, I do not see this as really a statement that changes the priority and the aspirational goal of dividends.

MR. JOHNSON:  We are not saying that priority changed, your Honor.  We are pointing to the factual statements by the company indicating that they could -- that they had structured the various aspects of the business in a way to allow them to ensure that the dividend could keep getting paid at its then current level.

THE COURT:  I do not see that.

MR. JOHNSON:  I understand, your Honor.  If you could indulge me and let me walk you through a few other points that hopefully will help illuminate this.

THE COURT:  Sure.

MR. JOHNSON:  So the point of that slide, the most pertinent point of that slide, your Honor, is about structuring the portfolio to protect against currency risk.  And I

K9OQabiO

emphasize that, your Honor, because currency volatility is what the defendants asserted created the need for them to cut the dividend in half months later in October.  So currency volatility and currency risk is central to this case.

THE COURT:  I don't read what you're saying as a representation.  A hedge is in the degree of perfection as time proves.  Now, you may feel that you have had a perfect hedge only to find out that the changes are such that your hedge is not perfect.  And here it says "93 percent fixed rate portfolio hedges against rising interest rates," but there's still currency risk that can foul it up.  The currency aspect is in a diversity of opportunities, but that doesn't completely cut the ice because there can be a global rise or fall in currency exchange that can cost a company very heavily.  These are objectives.  These are policies.  These are the best judgment of the company in how to hedge against both interest rate changes and currency changes.

Anheuser-Busch being an international company with strong sources of income from activities all over the world is subjected to various changes in rates of exchange between currencies and interest rate changes, and it says here that we're trying -- we think we've got a pretty good fix on this, but it doesn't make it an absolute representation.

MR. JOHNSON:  Your Honor, I understand what you're saying, and the reality is that, of course, there could be a

K9OQabiO

different set of facts where currency risks become greater, where currency volatility increases, where there are changes, that is a theoretical other set of facts.  What is before the Court is a set of facts where the defendants themselves acknowledge that the same currency volatility that resulted in them cutting the dividend in October was what they were seeing starting in April of the same year.  So there is no assertion --

THE COURT:  You take me through that.

MR. JOHNSON:  Sure, your Honor.

THE COURT:  We've done paragraph 45.  We've done paragraph 46.  What next should I look at?

MR. JOHNSON:  Sure, your Honor.  So, I am almost wondering if I should jump ahead to show you what I was referring to right then.

THE COURT:  You order your argument however you wish.

MR. JOHNSON:  All right, your Honor.

So, again, we are not simply relying on goals and aspirations.  Instead, this case is about factual assertions.  Another factual assertion by the defendants is found at paragraph 54.  I should give your Honor a moment to turn to it.

THE COURT:  Yes, please.  I'm there.

MR. JOHNSON:  So, your Honor, in the indented folded portion of this, you will see towards the bottom of the page one of the points we're bringing up here, "The factual

assertion that they believe their cash flows from these various sources will be sufficient" -- it goes over to the next page -- "will be sufficient to fund their capital expenditures, debt service, and dividend payments going forward."

That's just one piece of the puzzle here, your Honor. I'm not suggesting by any means that that alone is the case. It's not.

THE COURT:  Well, we have to take them one by one. When it says "we are of the opinion" that certain things are adequate, based on expected cash flow; in other words, it's a projection.  And what here is a misrepresentation?  Did they not have that opinion, do you think?

MR. JOHNSON:  Your Honor, yes, I don't think they had that opinion because of what they have said, not because of what's in my mind.

THE COURT:  How can you have an ability to prove what the financial officer's opinions were?

MR. JOHNSON:  Because of what they've said, and it's included in our complaint, your Honor.

So, at the end of this period in October of 2018, what the CFO, one of our defendants here, emphasized was that not that things had changed, not that circumstances were different than they expected, but in contrast to that, that the same circumstances they had been facing since April of that year were the reasons they were going to cut the dividend.

K9OQabiO

THE COURT:  Before we go on, look at the last part of paragraph 54 with all the indented paragraphs.  Doesn't that cut against what you're saying?  These are all comments that say we may be wrong in our opinion; that's our opinion, but we may be wrong.  And look at what happens?

MR. JOHNSON:  Your Honor, of course, there are going to be qualifications, but it would be one thing if the circumstances had changed.  What the defendants were conveying to the market was the message that under the circumstances present before us, we have plenty of cash, and they say that. We expect our dividends --

THE COURT:  Mr. Johnson, you could have an opinion that things will work out, and it turns out that they don't. It turns out that instead of a better world, it's not as good a world or it's the same world.

MR. JOHNSON:  All of that --

THE COURT:  How is that a misrepresentation?  That's an expectation.

MR. JOHNSON:  But, your Honor, if I know --

THE COURT:  We don't know when we will be rid of this pandemic.  Not even Dr. Fauci can say that.

MR. JOHNSON:  Your Honor, if I know facts that mean an expressed opinion cannot be correct --

THE COURT:  Yes, go on.  Let's look at another paragraph.

K9OQabiO

MR. JOHNSON:  OK, your Honor.

THE COURT:  You're not scoring.

MR. JOHNSON:  I hear you.  So paragraph 69.

THE COURT:  I'm there.

MR. JOHNSON:  Three and four lines down, Anheuser-Busch had plenty of cash to satisfy its obligations.

THE COURT:  In the quoted part?

MR. JOHNSON:  It's in there too, yes, your Honor.  So in the indented part, there is also an emphasis on "we expect our second half of 2018 cash flow generation to be much stronger on the higher end of this 65-75 percent range."

Several lines below that we have --

THE COURT:  Let me read it.

MR. JOHNSON:  Sure.

THE COURT:  So the company is saying we remain on track which may be a factual statement.  So, we remain on track to deleveraging, and approximately half a turn of net to EBITDA reduction per year with a combination of EBITDA growth, as I said, as well as debt pay-down.

Let's say that is a statement of fact.  Is it a misstatement of fact?

MR. JOHNSON:  It is, your Honor, because of what else is presented in the complaint, which includes the fact that at this very same time the defendants knew that the company was facing currency volatility that meant that they could not

K9OQabiO

continue to pay this dividend at that level, and they have acknowledged that fact.

THE COURT:  So, this statement that I just read is based on certain premises that are laid out in the overall quotes, and if those premises don't come out, then the final statement doesn't come out.  And they talk about currency fluctuations and interest rate fluctuations and the like.

MR. JOHNSON:  And, your Honor, what we're not focused on is some prediction.  What we're talking about is the reality that the defendants have acknowledged that during the same time when they're making these positive affirmative statements about how well structured the company is to withstand currency volatility, they knew and have acknowledged since then, that they knew then -- not about predictions, they knew then that the company was suffering from currency volatility that meant the dividend was at risk, was not secure, and at the same time they were also making comparisons.  I could show you something else in the complaint.

THE COURT:  Go ahead, show me something else.

MR. JOHNSON:  On page 36, your Honor, this is paragraph 75 and 76 I'll start with.  Both are on page 36.

THE COURT:  75, let me read it.

MR. JOHNSON:  Yes.  Take your time.

THE COURT:  You will have to explain to me.

MR. JOHNSON:  Understood, your Honor.  So these slides

are part of a presentation made at an investor seminar held by Anheuser-Busch.  The presentation was made by the defendant CFO in this case, and I want to be crystal clear, none of the statements in this presentation needed to be made.  There was no obligation that the company, that the CFO make these statements.  No SEC rule or regulation required that the company go into and the defendants go into --

THE COURT:  It's all right.  You can have a material misstatement even though it's not an obligatory statement.

MR. JOHNSON:  Your Honor, it's really an important point for us because there is no need -- there is no obligation to say this.  They made the choice.  They made the choice to make this --

THE COURT:  It doesn't really make a difference.  If you have an obligation to say things and you say it wrong, you can be liable.  But if you don't have an obligation to say things, but nevertheless say them, and they're wrong, you can be liable.  As long as the statements are material and people rely on them.

MR. JOHNSON:  Fair enough, your Honor --

THE COURT:  What here is something that is actionable?

MR. JOHNSON:  All right, your Honor.  So, just to take one-half step back.  Anheuser-Busch's common stock and ADR's are attractive to investors, and were then at least, because of the reliability of the dividend that was being paid and had

K9OQabiO

been paid for a decade and been steadily paid.  It had only gone up.

And what this slide at the top of page 36 is doing is it is comparing the situation ten years earlier when Anheuser-Busch and InBev merged, and under that scenario the CFO, the defendants emphasized that a dividend cut was necessary, and that's noted in the top right box where you see the arrow.  That arrow shows you what I'm referring to, your Honor.  And what the CFO was emphasizing was that when Anheuser-Busch and InBev merged, the path of deleveraging was different then.  They needed to take a dividend cut.

In contrast, look at the box below that, which is talking about the then recent acquisition of SAB Miller, and the point is we needed to make a dividend cut then, the implication is obvious, we don't need to make a dividend cut now.  The whole point of this slide and the whole point of the presentation is that our path to deleveraging is vastly different, and, by the way, that difference includes that back then ten years ago we needed to take a dividend cut, and now here in 2018 we don't need to do that.

And part of the reason, your Honor, that they were saying to investors that we don't need to make a dividend cut is explained in the next slide on the same page.

THE COURT:  What is FX volatility?

MR. JOHNSON:  FX stands for foreign currency, which is

K9OQabiO

just another way to say currency exchange.  It's another way to refer to currency volatility.

THE COURT:  You want me to turn to page 37?

MR. JOHNSON:  No.  Sorry, your Honor, I'm still on 36 but just the bottom slide.

THE COURT:  Yes.

MR. JOHNSON:  The slide under paragraph 76.

THE COURT:  Yes, I see it.

MR. JOHNSON:  So, a part of the reason that the defendants were saying we don't need to make a dividend cut now in contrast to what we had to do ten years ago is because as this slide in paragraph 76 says, our risk management framework is designed to address embedded volatility associated with our global footprint and then refers to FX volatility, which, again, is currency volatility.  So what the defendants are saying is --

THE COURT:  That we have good hedges.

MR. JOHNSON:  No.  They're saying:  That was then.  We needed a dividend cut then.  Now we have structured our company differently so we don't need a dividend cut in connection with what we're doing now, which is integrating SAB Miller into our company.

The problem with all of that is not that it's a prediction, it's that at the same time that they're saying these things, making these factual statements, they also know,

K9OQabiO

and we now know and have pled it with particularity, the defendants knew at that same time that the company was facing currency volatility that would in fact drive them to reduce the dividend.

THE COURT:  It overwhelmed the hedges.

MR. JOHNSON:  It was already there.  It was already there.  It's like saying you built a flood wall, but you know the flood waters are coming over the wall already.  If you don't acknowledge that you are already facing currency volatility that will drive your dividend down, that's not a prediction.

THE COURT:  That's not what this says.  This says that we have managed it.

MR. JOHNSON:  They say they've managed it, even though we now know because of their later admissions that they were facing currency volatility that would swamp their ability to continue paying their dividend and they used --

THE COURT:  When they say that they have adequate risk management, that they really believe they did not have adequate risk management but just said it regardless of whether it was true or not.

MR. JOHNSON:  They're saying we have risk management when at the same time they know their risk management is inadequate to deal with the currency volatility that was already hitting the company, and we know that from their own

K9OQabiO

mouths.  We know that from their admissions.

THE COURT:  Mr. Frawley is going to tell me that this is opinion, and I think he is right.  Whether you have adequate risk management or not is an opinion.  Whether you have perfect or imperfect hedges are opinions.  They're not fact.

MR. JOHNSON:  I understand how that could be the case in a different scenario, but if you know --

THE COURT:  In this scenario, in this scenario the company is expressing opinions, and you can't take them to task for expressing opinions unless they're dishonest, unless you have a memorandum, which you don't have that says I'm going to say this no matter if it's true or not.  In Judge Cardozo's words, if you say something is true, and you're indifferent to whether in fact it is true, you committed a misrepresentation.  We don't have that.

MR. JOHNSON:  But, your Honor, what we do have here is an admission by the defendants that at the same time they were saying that we have an adequate system for hedging against currency volatility, they knew they were already facing more currency volatility than their system could hedge against, they knew that then.

THE COURT:  Where is that statement?

MR. JOHNSON:  You can go forward to paragraph 80 on page 38.  I don't know if you are there yet, your Honor.

THE COURT:  He says, this scenario triggers some sort

K9OQabiO

of uncertainty and at a certain point we thought it was the right to adjust the dividend.

MR. JOHNSON:  And what he's not saying is that we have recently seen some different level of currency volatility. We've somehow experienced worsening currency volatility.  What he is saying is that in the last six months we've seen a lot of currency volatility.  That six-month period encompasses the times when they were making the statements we've gone over and some that we haven't gone over, but --

THE COURT:  They're saying that their experience is such that they don't have enough cash flow to pay down their debt.  And since the pay-down of debt or deleveraging is a more important priority than maintaining the dividend, they're allocating funds to deleverage and that may effect, and likely it will affect the dividend.  I don't see any misrepresentation here whatever.

MR. JOHNSON:  Your Honor, there is no assertion even by the other side that priorities changed.  This is about facts.

THE COURT:  I disagree with you.  It's about opinions. I disagree with you, Mr. Johnson.  I think we have a difference of opinion about this complaint.  You've shown me various statements which you argue show misrepresentations.  I've read these statements one by one with you, and I've expressed a contrary opinion that they do not show misrepresentations.  The

K9OQabiO

words that Mr. Frawley used, they're not actionable.

Unless there's more, I think I can rule. I don't want to cut you off.

MR. JOHNSON: Your Honor, I think that you've heard the gist of the points I have to make. While obviously we have a very different view about this, I understand what you're saying, I don't think that I've -- at least I can't say anything that goes above and beyond what we've talked about. Again, I would just emphasize that everything that I pointed to actually is a matter of factual assertion.

THE COURT: Mr. Johnson, I'm going to reserve decision, and I will think carefully about what you said and what Mr. Frawley said and deliver a decision probably in the next week or so.

I thank you all.

Mr. Frawley, you never really -- I never gave you a chance to finish. I take it I've got your points.

MR. FRAWLEY: I think you have them, your Honor. Thank you.

THE COURT: OK. Thank you both for excellent arguments. I will think about this some more and then come out with my decision.

MR. JOHNSON: One last thing, your Honor. If you do rule in favor of dismissing the complaint, we would ask for the opportunity to replead to clarify any of these points that may

K9OQabiO

be in doubt.

THE COURT:  I don't see a repleading, Mr. Johnson.  I don't think you can improve on these particular points.  I may be wrong, and you may convince the Court of Appeals that I made a wrong decision, assuming that I will find how I'm thinking right now, which may not be the case.  But if it is the case and I come out with a decision dismissing the complaint, I don't see how you can prove it.  I'm going to dismiss it with prejudice, which will enable you to appeal.

If I gave you a chance to replead, you're not going to change anything.  I think you've given me your best case, and it may be a correct case, but it's your best case, and I've reacted in a certain way.  I don't think you can do any better, so I would not give you a repleading.

MR. JOHNSON:  I hear you, your Honor.

THE COURT:  Thank you very much.

MR. JOHNSON:  Thank you, your Honor.

MR. FRAWLEY:  Thank you, your Honor.

(Adjourned)