UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x
                                                             :
                                                             :
                                                             :  **ORDER GRANTING MOTION**
In re ANHEUSER-BUSCH INBEV SA/NV                             :  **TO DISMISS**
SECURITIES LITIGATION,                                       :
                                                             :  19 Civ. 5854 (AKH)
                                                             :
------------------------------------------------------------ X

ALVIN K. HELLERSTEIN, U.S.D.J.:

    Lead Plaintiff City of Birmingham Retirement and Relief System ("Plaintiff") brought this putative class action against Anheuser-Busch InBev SA/NV ("Anheuser-Busch") and two of its officers for alleged securities fraud. The crux of Plaintiff's allegations is that, because Anheuser-Busch expressed the goal of sustaining its dividend and described how it was on track to achieve that goal, but the company instead cut the dividend months later, Defendants must have committed fraud. Because this is insufficient to plead fraud, the case must be dismissed.

## BACKGROUND

    Anheuser-Busch is the world's largest brewer. It owns over 500 brands, including Budweiser, Corona, Michelob, Bass, Stella Artois, Beck's, Modelo, Shock Top, Brahma, Blue Point, and Goose Island. Carlos Brito and Felipe Dutra (collectively, "Individual Defendants," and together with Anheuser-Busch, "Defendants") were, at the relevant times, Anheuser-Busch's Chief Executive Officer and Chief Financial and Solutions Officer, respectively.

    Anheuser-Busch, in its current form, is the product of several mergers and acquisitions. Most notably, in 2008, InBev acquired Anheuser-Busch Companies for $52 billion to form AB InBev. In 2016, Anheuser-Busch, the successor corporation, merged with SABMiller for $103 billion. The company also made a series of craft beer acquisitions before and after the SABMiller merger.

1

The result of these acquisitions was a high amount of debt. At the end of 2016, Anheuser-Busch's net debt was 5.5 times earnings before interest, tax, depreciation and amortization expense ("EBITDA"). The company publicly expressed a goal of deleveraging to a net-debt-to-EBITDA ratio of around 2.0.

A key issue, which lies at the heart of this suit, was whether Anheuser-Busch could progress toward its deleveraging goal while continuing to issue dividends at the same level as it had in prior years. In 2008, before closing the acquisition of Anheuser-Busch Companies, the company announced that it would have to cut its dividend. That cut resulted in a 2008 dividend of €0.28 per share. In the years that followed, dividends steadily increased. By 2015, the dividend reached €3.60 per share, and it remained at that amount for 2016 and 2017.

In 2018, Anheuser-Busch's leadership made numerous statements indicating it was on track to meet its deleveraging targets *and* maintain or grow its dividend. Plaintiff alleges that those statements were materially false and misleading. The alleged misstatements include the following:

- In a March 1, 2018 press release announcing its financial results for the fourth quarter of 2017, Anheuser-Busch said it was "tracking in line with [its] internal deleveraging targets," it "continue[d] to expect dividends to be a growing flow over time, although growth in the short term [was] expected to be modest given the importance of deleveraging," "EBITDA increased by 13.4% in FY17," and "[t]he combination with SAB [had] exceeded [the company's] expectations." Am. Compl. ¶¶ 41-43.

- In a March 1, 2018 quarterly report presentation, Anheuser-Busch said it had "sufficient liquidity and [did] not need to access the capital markets to meet [its] short-term funding needs," its debt portfolio was "structured to protect against

interest rate and currency risk," and reiterated its expectation of modest dividend growth. Am. Compl. ¶¶ 44-46.

- In a March 1, 2018 conference call with analysts and investors, Dutra said the company's debt portfolio "reduc[ed] . . . exposure to markets [sic] volatility," it was "tracking in line with . . . internal deleveraging targets," and the "goal [was] for dividends to be a growing flow over time consistent with the noncyclical nature of [the] business." Am. Compl. ¶¶ 47-49. In the same call, Brito highlighted EBITDA growth and that the total dividend for 2017 was "in line with the prior year." *Id.* ¶ 50

- On March 19, 2018, Anheuser-Busch filed its Form 20-F, which was certified by Brito and Dutra. In the Form 20-F, Anheuser-Busch listed as one of its risks that the company "may be unable to pay dividends," a risk that would "depend on factors such as . . . business outlook, cash flow requirements and financial performance, the state of the market and the general economic climate and other factors, including tax and other regulatory considerations." Am. Compl. ¶ 53. In the Form 20-F, the company also said it "believe[d] that [its] cash flows from operating activities, available cash and cash equivalents and short-term investments, along with [its] derivative instruments and [its] access to borrowing facilities, will be sufficient to fund [its] capital expenditures, debt service and dividend payments going forward." *Id.* ¶ 54. Additionally, Anheuser-Busch highlighted the effectiveness of its disclosure controls and procedures and "hedge policies designed to manage commodity price and foreign currency risks." *Id.* ¶¶ 55-56.

- In a May 9, 2018 press release announcing its financial results for the first quarter of 2018, Anheuser-Busch said it "continue[d] to expect dividends to be a growing

3

flow over time, although growth in the short term is expected to be modest given the importance of deleveraging," EBITDA was increasing, and that integration of SABMiller was "progressing well" in terms of synergies and cost savings. Am. Compl. ¶¶ 58-59.

- In a May 9, 2018 quarterly report presentation, Anheuser-Busch reiterated similar points regarding modest dividend growth. Am. Compl. ¶ 60.

- In a May 9, 2018 conference call with analysts and investors, Dutra said that "cash flow generation is much stronger in the second half" of the year, "deleveraging remains [their] priority and capital allocation remains unchanged," they "see dividends as a growing flow over time," "synergy guidance remain[ed] at $3.2 billion to be delivered within the 4-year period following the close of the [SABMiller merger]," "optimal capital structure remains a net debt-to-EBITDA ratio of around 2x, and [their] capital allocation objectives remain unchanged." Am. Compl. ¶¶ 61-63.

- In a July 26, 2018 press release announcing its financial results for the second quarter of 2018 second quarter, Anheuser-Busch said it "continue[d] to expect [its] growth to accelerate in the second half of [the] year," "continue[d] to expect dividends to be a growing flow over time, although growth in the short term is expected to be modest given the importance of deleveraging," "integration with [SABMiller] continue[d] to go as planned," and the company "remain[ed] on track in [its] deleveraging path." Am. Compl. ¶¶ 65-66.

- In a July 26, 2018 quarterly report presentation, Anheuser-Busch reiterated its expectation of modest dividend growth. Am. Compl. ¶ 67.

- In a July 26, 2018 conference call with analysts and investors, Dutra touted the structure of the company's debt portfolio, said the company "remain[ed] on track

4

- in [its] deleveraging path," said he "expect[ed] second half cash flow generation to be much stronger," and said the company had "a benefit mix of currencies that mitigates the FX risk." Am. Compl. ¶¶ 68-69.

- At an investor seminar held from August 7, 2018 through August 9, 2018, Dutra compared Anheuser-Busch's condition to 2008, the last time the company had cut dividends. He said, "we have almost doubled our EBITDA, our debt is much cheaper and longer dated, we enjoy a significantly larger liquidity cushion, have limited short-term refinancing needs, and - unlike in 2008 - we do not have any financial covenants." Am. Compl. ¶ 71. During the seminar, he also said the company's "financial position [was] far stronger than it was during the [2008] Anheuser-Busch combination" and that "no drastic measures were required for [the company] to deleverage as a result of the [SABMiller] combination." *Id.* ¶¶ 72-74. In a presentation slide at the seminar, Dutra listed the dividend cut as part of the "path to deleveraging" following the 2008 Anheuser-Busch Companies acquisition but not following the 2016 SABMiller merger. *Id.* ¶ 75.

*See also* Am. Compl. ¶¶ 41-50, 53-56, 58-63, 65-69, 71-77 (collecting all alleged misstatements).

Plaintiff alleges these statements were materially false and misleading because they misrepresented and failed to disclose several adverse facts, including:

- "that Anheuser-Busch could not grow or maintain its dividend and still meet its stated deleveraging targets and avoid having its credit ratings downgraded";
- "that Anheuser-Busch was not in fact on track with the Company's stated deleveraging targets without taking drastic measures, including cutting the dividend";

- "that the devaluation of key emerging market currencies and input cost inflation were having a material adverse effect on the Company's margins, EBITDA and profitability";

- "that the Company's liquidity and cash flow levels were not in fact sufficient to achieve modest short term dividend growth, or at a minimum maintain its then-current dividend, as promised";

- "that as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company's then-current business operations and future financial prospects, including dividend growth, liquidity, currency risk, cost synergies, and Defendants' then-current efforts to deleverage Anheuser-Busch's balance sheet"; and

- "that Anheuser-Busch's disclosure controls were not in fact effective."

Am. Compl. ¶¶ 51, 57, 64, 70, 78.  Furthermore, according to Plaintiff, by July 2018, Defendants knew or were reckless in not knowing that the Company would significantly reduce its dividend.

On October 25, 2018, Anheuser-Busch announced that it was cutting its dividend by 50% "in light of recent currency volatility" and to "accelerate deleveraging toward [its] optimal capital structure of around a 2x net debt to EBITDA ratio." Am. Compl. ¶ 36.  In a conference call that same day, Dutra reiterated that the dividend cut was necessary to accelerate deleveraging and to respond to uncertainty brought on by currency volatility over the preceding six months. Am. Compl. ¶¶ 36-37.  The price of Anheuser-Busch American Depositary Shares ("ADS") dropped from $82.25 per share to $74.54 per share, a decline of approximately 9.5%.

Investors brought this suit.  I appointed City of Birmingham Retirement and Relief System as Lead Plaintiff.  *See* Order Appointing Lead Plaintiff and Approving Selection of Lead Plaintiff (Sept. 12, 2019), ECF No. 28.  In the operative Amended Complaint, Plaintiff, on behalf of a putative class of investors who purchased Anheuser-Busch ADS between March

1, 2018 and October 24, 2018, brings a claim against Anheuser-Busch for violation of Exchange Act § 10(b) of and Rule 10b-5 ("Count One") and against the Individual Defendants for violation of Exchange Act § 20(a) ("Count Two").  Defendants move to dismiss.

## DISCUSSION

"[T]o maintain a private damages action under § 10(b) and Rule 10b–5, 'a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP*, 603 F.3d 144, 151 (2d Cir. 2010) (quoting *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008)).  To plead a claim for control person liability under Section 20(a), a plaintiff must allege "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  At this stage, I must accept as true all facts pleaded in the complaint. *ATSI Commc'ns,* 493 F.3d at 93.

Furthermore, a claim for securities fraud must satisfy the heightened pleading requirements set forth in Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA") "by stating with particularity the circumstances constituting fraud." *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,

7

553 F.3d 187, 196 (2d Cir. 2009); *see also* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."). Under the PSLRA, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Additionally, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2)(A).

### I. The Alleged Misleading Statements Are Not Actionable

The PSLRA provides a safe harbor for certain "forward-looking statements." 15 U.S.C. § 77z–2(c). Forward-looking statements include, *inter alia*, a "statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items"; "a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer"; and "a statement of future economic performance." *Id.* § 78u-5(i)(1)(A)-(C). Under the safe harbor provision, a defendant is not liable for a forward-looking statement that "is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." *Id.* § 77z–2(c)(1)(A)(i).

Most of Defendants' alleged misstatements are some version of the assertion that Anheuser-Busch was "tracking in line with [its] internal deleveraging targets" and that it "continue[d] to expect dividends to be a growing flow over time, although growth in the short term is expected to be modest." *See, e.g.*, Am. Compl ¶¶ 41-42. These discussions of projected performance and dividends, even mixed with statements about current progress, are forward-looking statements. *See In re Adient plc Secs. Litig.*, No. 18-CV-9116 (RA), 2020 WL 1644018,

8

at *19 (S.D.N.Y. Apr. 2, 2020) ("Even statements about [defendant] being 'on track' with respect to its projected margin expansion are 'forward-looking' statements within the meaning of the PSLRA, and not statements of 'present fact.'"); *In re Supercom Inc. Secs. Litig.*, No. 15 Civ. 9650 (PGG), 2018 WL 4926442, at *21 (S.D.N.Y. Oct. 10, 2018) ("[W]hen the present-tense portion of mixed present and future statements does not provide specific information about the current situation, but merely says that, whatever the present situation is, it makes the future projection attainable, the present-tense portion of the statement is too vague to be actionable apart from the future projection.").

They were also accompanied by appropriate cautionary language. Anheuser-Busch's Form 20-F was the source of some of the alleged misstatements and was incorporated by reference into the others. *See* Declaration of Brian Frawley ("Frawley Decl."), Ex. H, ECF No. 43-8 (Form 20-F); *see also, e.g.*, Frawley Decl., Ex. I, EC No. 43-9, at 15 (press release explaining that "forward looking statements should be read in conjunction with the other cautionary statements that are included elsewhere, including AB InBev's most recent Form 20-F"). It the cautionary language of its Form 20-F, Anheuser-Busch explained, among other things, "***We may be unable to pay dividends.***" Frawley Dec., Ex. H, ECF No. 43-8, at 23 (emphasis in original). It continued

> As a general matter, we cannot guarantee that we will pay dividends in the future. The payment of dividends will depend on factors such as our business outlook, cash flow requirements and financial performance, the state of the market and the general economic climate and other factors, including tax and other regulatory considerations. In particular, in light of the increased debt that resulted from completion of the combination with SAB, deleveraging remains a priority and may restrict the amount of dividends we are able to pay.

*Id.* While Plaintiff may have liked stronger cautionary language, that is not what the PSLRA's safe harbor requires. Anheuser-Busch's statements constitute "meaningful cautionary statements

identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 77z–2(c)(1)(A)(i).

This is consistent with authority in the Second Circuit. In *In re International Business Machines Corporate Securities Litigation*, ("*IBM*"), the Second Circuit addressed alleged misstatements about the prospect of a dividend cut, including such statements as "I have no real plan, no desire, and I see no need to cut the dividend," and "We have no plans nor need to do anything about the dividend." 163 F.3d 102, 105 (2d Cir. 1998). The Court held that the challenged statements were "expressions of optimism or projections about the future" that "concern[ed] an uncertain future event—the payment of dividends." *Id.* at 107. They were not actionable unless "worded as guarantees," "supported by specific statements of fact," "or if the speaker does not genuinely or reasonably believe them." *Id.* I recognize that *IBM* is distinguishable from this case. Most notably, the Court dismissed the case on summary judgment, with the benefit of a factual record. Additionally, the PSLRA did not apply to *IBM* because the case was filed prior the PSLRA's enactment. *See In re Gen. Elec. Co. Secs. Litig.*, 857 F. Supp. 2d 367, 388 & n.3 (S.D.N.Y. 2017). Nonetheless, *IBM*'s holding is instructive in setting the basis for an important dichotomy: statements merely expressing a plan or desire to sustain dividends, in contrast to statements guaranteeing dividends. *See id.* at 388.

The present case is most similar to *In re BHP Billiton Limited Securities Litigation*, 276 F. Supp. 3d 65 (S.D.N.Y. 2017). There, the defendant company stated a policy "to steadily increase or at least maintain [its] base dividend," and its CEO said the company would only abandon that dividend policy "over [his] dead body." 276 F. Supp. 3d at 86. After the failure of a dam owned by the company led to nineteen deaths, an environmental disaster, and financial hardship, the company cut its dividend by over 74%. *Id.* at 70-71. Plaintiffs alleged that statements regarding the company's dividend policy were materially false and misleading because, given the company's problems and the risks of the dam's failure,

10

management could not reasonably represent that the dividend would be safe. *Id.* at 87. The Court held, however, that plaintiffs failed to allege the statements were misleading or otherwise actionable because plaintiffs "d[id] not argue that the progressive dividend policy was not indeed a priority," "the statements were either inherently aspirational or forward-looking in nature, and in the latter case are protected by the PSLRA's safe harbor," "and because plaintiffs [did] not claim that the statements were made with actual knowledge that they were false or misleading." *Id.*

*In re General Electric Co. Securities Litigation*, 857 F. Supp. 2d 367 (S.D.N.Y. 2012), on which Plaintiff relies, is distinguishable. There, certain assurances about dividends were actionable because they were phrased as guarantees and/or allegedly made with actual knowledge of their falsity. *Id.* at 388. For example, the company's CEO said, "You can count on a great dividend, $1.24 board approved at the board meeting last Friday." *Id.* at 377. Plaintiff can point to no similar guarantee in the present case. Instead, Anheuser-Busch said it continued to expect a modestly growing dividend. In *General Electric*, the Court even held that, under *IBM*, a more conservative statement that "d[id] not proclaim that GE's 2009 dividend is a sure thing" and "explain[ed] what conditions might cause GE to reduce or eliminate the dividend" was not actionable. *Id.* at 403.

The only allegedly misleading statements that arguably fall outside the PSLRA's safe harbor are statements regarding Anheuser-Busch's debt profile in relation to exposure to currency volatility. *See. e.g.*, Am. Compl. ¶¶ 47, 69. However, Plaintiff fails to allege how these statements were false or misleading. "[P]laintiffs must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004). Plaintiff does not contend that Defendants misrepresented their efforts to mitigate currency risk. Rather, they argue that Defendants omitted the extent to which currency volatility placed the dividend in danger. However, the only

11

factual basis for this assertion is that currency volatility was ultimately one of the justifications for cutting dividends months after the challenged statements. This constitutes impermissible fraud by hindsight. *See Local No. 38 Int'l B'hood of Elec. Workers Pension Fund v. Am. Exp. Co.*, 724 F. Supp. 2d 447, 463 (S.D.N.Y. 2010) ("Plaintiff fails to allege that Henry was aware of specific adverse credit data showing that loss reserves were too low. To the extent Plaintiff relies on the fact that the loss reserves proved inadequate, such allegations must be rejected as a classic example of fraud by hindsight." (internal quotation marks omitted)).

Defendants' alleged misstatements are also nonactionable statements of opinion. "[A] sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless whether an investor can ultimately prove the belief wrong." *Omnicare, Inc. v. Laborers Dist. Council Constr. Industry Pension Fund*, 575 U.S. 175, 186 (2015). Under *Omnicare*, a statement of opinion is not actionable under the securities laws unless "the speaker did not hold the belief she professed," "the supporting fact she supplied were untrue," or the speaker "omits material facts about [the speaker's] inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself." *Id.* at 185-89.

Plaintiff does not dispute that Defendants' statements about dividend growth were statements of opinion. Instead, Plaintiff argues that the statements are actionable because they omitted material information about financial challenges that would restrict the dividend, including currency volatility, credit rating pressure, input cost inflation, and cash flow. However, again, Plaintiff does not allege with specificity that any of these constraints rendered Defendants' statements misleading when made. The existence of financial challenges, particularly where Defendants had acknowledged these challenges and outlined efforts to mitigate them, does not render Defendants' optimistic opinion statements actionable. *See Omnicare*, 575 U.S. at 189 ("An opinion statement . . . is not necessarily misleading when an

12

issuer knows, but fails to disclose, some fact cutting the other way. Reasonable investors understand that opinions sometimes rest on a weighing of competing facts."). To the contrary, a reasonable investor would have taken Defendants' statements to mean that risks existed but the company was confident in its efforts to minimize its exposure. *See Tongue v. Sanofi*, 816 F.3d 199, 211-13 (2d Cir. 2016).

## II. Plaintiff Fails to Allege Scienter

Even if Plaintiff had sufficiently pleaded actionable misstatements, their claim under Section 10(b) and Rule 10b-5 would fail due to insufficient pleading of scienter. "While we normally draw reasonable inferences in the non-movant's favor on a motion to dismiss," the PSLRA "establishes a more stringent rule for inferences involving scienter, and requires that a plaintiff's complaint 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 194 (2d Cir. 2008) (quoting 15 U.S.C. § 78u-4(b)(2)). "The requisite state of mind in a section 10(b) and Rule 10b–5 action is an intent to deceive, manipulate, or defraud." *ECA*, 553 F.3d at 198 (internal quotation marks omitted). Recklessness suffices. *Id.* This "requisite scienter can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* Plaintiff attempts to rely on the latter theory but is not successful.

Plaintiff's principal allegations on the issue of scienter are that the Defendants were responsible for the statements released by the company and thus were privy to the information that made those statements materially false and misleading. Plaintiff also highlights that, by virtue of their positions, Brito and Dutra would have been aware of the importance of Anheuser-Busch's dividend and thus would have paid attention to the likelihood of cutting it, would have been familiar with the company's financial metrics, and would have been

13

responsible for maintaining appropriate controls and disclosures as required by the Sarbanes-Oxley Act.

These vague allegations are insufficient.  "[C]ourts have routinely rejected the attempt to plead scienter based on allegations that because of defendants' board membership and/or their executive managerial positions, they had access to information concerning the company's adverse financial outlook." *In re Health Mgmt. Sys., Inc. Secs. Litig.*, No. 97 CIV. 1865(HB), 1998 WL 283286, at *6 (S.D.N.Y. June 1, 1998).  Plaintiff does not point to any financial metric, report, or other piece of information that, at the time of the challenged statements, precluded the possibility of maintaining dividend levels.  *See Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) ("Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information.").  Plaintiff certainly does not point to any Defendant's awareness of or reckless disregard of such information.  Plaintiff also does not contend that Defendants had already planned to cut the dividend at the time of the challenged statements.  Absent some particularized facts giving rise to an inference of scienter, Count One must be dismissed.

**III.    Control Person Liability**

A claim for control person liability under Section 20(a) requires, first, a primary violation of a securities law.  *ATSI Commc'ns*, 493 F.3d at 108; *see also* 15 U.S.C. § 78t(a).  Because Plaintiff has failed to plead a primary violation under Count One, it cannot establish control person liability.  *Id.*  Accordingly, Count Two is dismissed.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted. The Clerk is directed to close the open motion (ECF No. 41) and close the case.

SO ORDERED.

Dated:  September 29, 2020                /s/ Alvin K. Hellerstein
        New York, New York                ALVIN K. HELLERSTEIN
                                          United States District Judge